Curia.

This cause has been twice fully tried, once before a court competent to decide ultimately all questions of law, which arose in the trial, and the verdict has in both- instances been in favor of the demandant, with the approbation of the Court; yet as the new organization of the Court intervened between the first and second trial, the tenant has the right to take the course he now pursues, and if any misdirection of the judge can be shown, he will have the privilege of a third trial before another jury.
The points, in which the judge is supposed to have mistaken the law, are particularly specified in his report of the case before us.
[ * 360 ] * The first relates to his construction of the proprietary grant of 1680, which gives to William Noyes, under whom the demandant’s ancestor held, “ a piece of land below high-water marie to set a shop upon, not exceeding forty feet in width.” It is said by the tenant’s counsel, that no more land passed by the grant, than was actually covered by such shop as the immediate grantee may have placed upon it; whereas the judge directed that all the land and flats between high and low-water mark, of the width of forty feet, were the subject of the grant, provided they did nc t extend more than one hundred rods from the upland ; and we are all of opinion that, in this decision, the judge was correct. Whatevei might be the construction of analogous words in a recent convey anee, made in times of precision and accuracy, and when consider *317 able value .s attached to flats in the beds of rivers, creeks, and coves, it is obvious that to apply rigid rules of construction to transactions which took place early after the settlement of the country, when conveyancing was little understood, and when the mud of a river or harbor was supposed to be worth nothing, would often be attended with injustice, and in many instances subvert the titles to property of almost incalculable value.
Whether a mere vote of a proprietary at the present day, without any deed or location in pursuance of such vote, would pass lands from such proprietary to an individual, not a member of the corporation, is questionable ; but it is well known that almost all the titles, which have been derived from proprietors of townships, have nothing better to depend upon than a vote recorded in the proprietors’ books; and where a possession was taken in conformity to the vote, and transmitted by the grantee to his heirs or assigns, titles so acquired have been respected and maintained in our courts of law (10).
Nor indeed can there be any doubt, that the construction given by the judge, as to the extent of this grant, was conformable to the true intent of the proprietors in making the grant. By the statute of 1641, it was declared that the owners of upland should own the flats to low-water mark, unless these should exceed the distance of one hundred rods from the upland, in which case they were to be restricted to that * distance. Under that [ * 361 J statute, the proprietors of Newbury became the proprietors of all the flats in the river Merrimack down to the channel, that being within the distance before mentioned. Now, it is very fairly to be presumed that, in 1680, these proprietors were desirous to settle their township, and they were inviting mechanics and other valuable settlers, by offering them advantageous situations upon the river, situations then of little consideration as to their value, though since become so important. William Noyes applied for a place below high-water mark to set a shop upon, which was granted him. The object of Noyes in seeking such a place must have been an access from the river to his shop. The proprietors take care to limit his extent upon the shore, confining him to forty feet. But they do not limit him towards the river. Is it to be supposed that they intended to reserve the flats between the grantee’s shop and the channel to themselves, and so have it in their power entirely to frustrate the manifest object of their grant to Noyes ? This would have been an extremely hard bargain on the part of Noyes, had such *318 intention been expressed; but certainly so unjust a provision ought not to depend upon slight implication.
The common maxims of law, applicable to the construction of instruments, will come in aid of the probable intent of the parties, in ascertaining the legal effect of this grant. Doubtful words and provisions are to be taken most strongly against the grantor, he being supposed to select the words which are used in the instrument. In this grant of the proprietors, they give three sides of the lot which they convey, and leave indefinite the fourth ; it must be taken that they intended that the extent of the lot in the rear should be limited only by their claim. And the legal construction of their own words will not be thought to operate rigorously, if we carry our minds back to the year 1680, when, from testimony in the case, we may reasonably infer that the channel ran so much nearer the upland as to leave no flats between Noyes’s shop and the channel worth the attention of the proprietors.
But, in addition to all this, it appears in the case, that all those who occupied under the grant to Noyes, claimed and used the flats, as they needed them, in the rear of the breastwork, [ * 362 ] *upon which the shop was placed ; and this too in the view of the proprietors and their agents, for nearly the space of a century after the grant was made ; during all which time no complaint was made by the proprietors, and no act of ownership exercised by them. Here, then, was a practical construction by both parties, sufficient to remove all doubts as to the true extent of the grant. It is true that, in 1750, the proprietors undertook by their need to convey these flats to Spencer Bennett; but at this time Perkins, the demandant’s ancestor, was in possession as tenant in common with Bennett, claiming derivatively under Noyes, the first grantee, and immediately from Bennett himself, who, in 1742, sold to him one moiety of these very flats. Now, if any thing passed from the proprietors, it inured to the use of Perkins, as well as Bennett (11), and on this ground, the claim set up by the tenant, who claims under Bennett, is without foundation.
The second exception to the judge’s charge relates to his decision, that the deed from Bennett to Perkins in 1742, created a tenancy in common between the grantor and grantee of the flats in question. Previous to the date of this deed, Perkins had conveyec to Bennett all the flats, as also an upland lot which the proprietors had granted to the same William Noyes in 1721, and by this deed *319 Bennett conveyed back to Perkins one half of the upland or house-lot by metes and bounds, and one moiety of the flats behind the house in quantity and quality. Can it be doubted that this created an estate in common and undivided in those flats? We are at a loss to imagine any form of words more technically proper for this purpose.
But it is said, and this constitutes the third exception, that the parties occupied in severalty, and that this several occupancy was a partition in fact, which ought to have concluded against the demand-ant’s action, which is brought for an undivided moiety. Whether there was a several occupancy or not, was matter of fact for the jury; and although the judge intimated an opinion that there was not sufficient evidence to prove it, yet we do not find that he withheld any evidence on this point, nor do we find any evidence in the depositions submitted to us, from which the jury could have inferred that fact.
* The fourth exception, relied upon by the counsel for [ * 363 ] the tenant, respects the opinion delivered by the judge relative to so much of the flats as may have gathered by alluvion since the death of the demandant’s ancestor. To give this objection its full force, we must recur to some of the testimony used in the case, by which it appeared that the channel of the river Merrimack, towards its mouth, had considerably receded from the shore on the Newbury side; and some of the witnesses imputed this to the numerous improvements, which have been made on the bank of the river, and on the flats, by the erection of wharves, &c. It is contended that the ancestor could have been seised only of so much of the flats as existed in his lifetime; and as the demandant has declared on the seisin of her ancestor, she cannot recover more than he was actually seised of.
But we do not think much of this objection. It has already been shown that the ancient statute, relative to the subject of flats, annexed them to the adjoining upland, to the distance of one hundred rods from the shore. Whatever increase, therefore, happened from natural causes, or from a union of natural and artificial causes, within that distance, must be to the benefit of the owner of the upland, or of him who owned the flats to which the increase- wns attacned. This increase is of necessity gradual and imperceptible (12). No man can fix a period when it began, no testimony can mark the exact margin of the channel on any given day or year.. The ancestor beinff seised of the estate, of which all the flats now *320 demanded are part, and having the right by law to all such additions as should be made by the gradual retiring of the waters, he must be supposed to have been seised of all which now exists, for no one can show any parcel of which he was not seised. We think the opinion delivered at the trial right on this point; and, further, we think this an instance in which we may safely apply the maxim, l).i minimis non curat lex.
The form of the verdict constitutes the last exception. It is said this is uncertain, and no judgment can be rendered upon it.
[ * 364 ] * The verdict is conformable to the nature of the demand, and a judgment thereon will be sufficiently certain to. enable the sheriff to execute it by an habere facias. We are, therefore, all of opinion that judgment must be entered according to the verdict.
Note. The Chief Justice was of counsel in this cause, while at the bar, and of course was not on the bench during the argument or decision of it.

 [Springfield vs. Miller, 12 Mass 415.—Codman vs. Winslow, 10 Mass. 146.-Baker vs. Fates, 16 Mass. 497.—Rehoboth & Seekonk vs. Hunt, 1 Pick. 224.—Ed.]

 [Porter vs. Hill, 9 Mass. 34.—But a quitclaim deed without warranty, will not operate to carry a title subsequently acquired.—Jackson vs. Winslow, 9 Cowen, 13.— No; it seems, will such a deed with a covenant of warranty against all ilaiming undei the 'eleasor.—Comstock vs. Smith, 13 Pick. 116.—Ed.]

 [Rex vs. Lord Yarborough, 4 D. & R. 790.—5 Bingh. 193.—Scrafton vs. Brown 6 D & R. 536.-4 B. & C. 485.—Ed.]