Bigelow, J.
The effect of the vote of the proprietors of the town of Worcester, passed in the year 1733, that “ one hundred acres of the poorest land on Millstone hill be left common for the use of the town for building stones,” has already been partially considered by this court in the case referred to in the agreed statement of facts. Worcester v. Green, 2 Pick. 425. It was there held, that the land itself did not pass by the vote to the town; but that the fee remained in the proprietors and was conveyed by a subsequent grant from them to one Hayward, from whom the plaintiff in this action, by mesne conveyances, derives his title. The object of the present suit is to ascertain and define the precise nature and extent of the grant under the vote, and thus to determine the relative rights of the owners of the fee, and of the town and its inhabitants, in the premises in question.
It is urged, on the part of the plaintiff, that the vote of the proprietors was a mere license, revocable in its nature, and that it was in fact revoked by the subsequent grant, or that, if it was a grant, yet, not having been put on record in the registry of deeds, it must yield to the recorded conveyance afterwards made to Hayward. But it is quite too late, at the present day, to impeach the validity of this grant on such grounds. It has long been the settled law of this common *25 wealth, that proprietors in common had authority in early times to alienate their lands by vote, which, if duly recorded on the books of the proprietary, passed the title and constituted competent evidence of the transfer. 4 Dane Ab. 77, 121; Adams v. Frothingham, 3 Mass. 352; Codman v. Winslow. 10 Mass. 146; Springfield v. Miller, 12 Mass. 415; Baker v. Fales, 16 Mass. 497.
In the early period of our colonial history, large tracts of land lying in a body of several miles in extent, in various parts of the province, were from time to time granted by the provincial government to individuals, constituting a proprietary, who organized themselves under the colonial laws, kept records of their proceedings, managed and divided their property, and disposed of it by votes of a majority duly recorded on their books of record. Anc. Chart. 402, 686. These books thus became the great sources of title, to which reference was had as being the highest and best evidence of it; and from votes, recorded only on such books of the proprietors, a large number of titles throughout the commonwealth is derived. Lands thus granted by vote were held in severalty by many persons, within the limits of the several proprietaries, long before any other place or mode of recording conveyances of real property than on such proprietors’ books, was in existence. Such was the case in the proprietary, which comprehended within its limits the territory of the present city of Worcester. Under, the original grant to Gookin and others, many tracts of land had been granted by votes of the proprietors to actual settlers and others, (long prior to the establishment of the county of Worcester by the colonial legislature in 1731,) under which titles ever since have been and now are held. There can be no doubt, therefore, that this vote did operate as a grant of a qualified right to the premises in question, which was valid and effectual as against a subsequent purchaser, and subject to which the owner of the fee originally took his title from the proprietors.
In considering the nature and extent of the right thus granted, and the proper construction to be given to the vote by which it was created, it is to be borne in mind, that the *26 great object is to ascertain, if possible, the intent of the grantors, and to carry that intention into effect, so far as it can be done consistently with the rules of law. To do this, it is necessary to take into view the subject matter of the grant, the time and circumstances under which it was made, and to interpret in a liberal spirit the brief and inartificial language in which, like all similar grants, it is expressed. The vote was passed at an early period after the first permanent settlement was made under the proprietary grant. The interest of the proprietors, at that time, would naturally prompt them to hold out such facilities and advantages, as might induce persons to take up lands and become actual settlers on their territory. The premises in question, if we may judge from the terms of the vote, were esteemed of less value for agricultural purposes than other portions of their possessions. They contained a quarry of stone readily accessible and of a kind suitable for building material. The appropriation of it to the use of those, who might have occasion to erect houses or other structures in the town, was alike conducive to the interests of the proprietors, and of those who might desire to purchase their lands, and become settlers on the territory. The object of the former was to dispose of their land to actual settlers; while the latter, among their first necessities, in a new and comparatively wild region, would require suitable materials for the erection of dwellings and other structures. In this view, we think it was manifestly the intent of the grantors to give to the inhabitants of the town, and to those who, from time to time, should become such by purchasing their lands and settling on them, the free use of the premises in question as a quarry from which they might supply themselves with stones for building. That it was not intended as a grant to the town, in its corporate capacity, to be used for corporate purposes only, we think is clear from several considerations. In the first place, the extent of the grant, being a right to take stone in one hundred acres, was altogether disproportionate to the limited wants of the town, either present or prospective, for public buildings only. Then, the use of the words in the vote “ left common,” indicate an intent to confer the enjoy *27 ment of the right on the inhabitants in their individual capacities, and not merely on the town in its corporate right. But perhaps the most weighty consideration is the apparent want of motive on the part of the proprietors, in making so extensive a grant to the town for its own use only, and the very strong inducement which they have in giving it for the use of all the inhabitants. It is equally clear, that it was not intended to confer the right on those only who were inhabitants of the town at the time of the grant, for it could not in such case enure to the benefit of their successors, nor to the use of those who might, from time to time, become inhabitants with them. Such a construction would defeat the main purposes of the grant. It would seem to follow, as a necessary consequence, that the intent of the grantors was to give this right to be used and enjoyed by all those who were at the time of the grant, or who at any time afterwards should become inhabitants of the town of Worcester. Nor can we see any difficulty in carrying out this intention consistently with the rules of law. It was competent for the proprietors, being the owners of the entire fee, to separate the quarry of stone from the surface of the earth, and make distinct possessions and different inheritances of the soil and its products and of the stone which underlaid them, and when so separated, the quarry retained all the qualities of real estate, so as to be held and transmitted in like manner. Bainbridge on Mines, 4; Co. Lit. 6 a; Comyn v. Kyneto, Cro. Jac. 150; Barnes v. Mawson, 1 M. & S. 77; Adam v. Briggs Iron Co. 7 Cush. 361, 367.
The words of the grant are, “ to be left common for the use of the town.” Applying to this language the liberal and benignant rules of interpretation which have always been adopted in construing ancient grants of this kind; Baker v. Fales, 16 Mass. 497; it is equivalent to a grant to the town in its corporate capacity, to be held in trust for the use and benefit of its inhabitants, or to use more nearly the words of the vote, it is granted to the town to be left common for the use of the inhabitants. The town was capable of taking the grant and of being seised to such a use. 1 Cruise, (Greenl. *28 ed.) 291, 370 ; 2 Kent Com. (6th ed.) 278, 279. Commons, training fields, and burial grounds, are familiar instances of real property held in like manner, the legal estate being vested in the town, and the use and enjoyment of the premises being in the inhabitants. The intent of the grantors could be carried into effect in no other way. The use could not be executed in the inhabitants of the town as individuals, because, being constantly changing and fluctuating, they could not take and hold the legal estate in succession; but the town in its corporate capacity could take the grant and hold it in trust, the beneficial use being in those who, from time to time, should become inhabitants of the town.
Such being the proper construction of the grant, it only remains for us to define the extent of the right conferred by the use of the term “ for building.” Adopting the liberal interpretation already applied to the terms of the grant, it would seem to include the right to get stone for the use of the inhabitants, not merely for buildings, in the narrow and restricted sense of that word, but for all those structures and purposes, for which such material, in the progress of time and the arts, may be made useful. In this sense, it would not be a violation of the right, to appropriate the stone to the building of fences, bridges, arches, culverts, drains, curb-stones, monuments in cemeteries, and to the various ornamental uses to which it is usually applied. Livingston v. Tenbroeck, 16 Johns. 14.
The only limitation, as to the persons by whom the right is to be enjoyed, is that the stone shall be for the use of the inhabitants of Worcester. Therefore, whether it is quarried and prepared by the inhabitants themselves for their own use, or by persons, who, like the defendant, make it their business to procure it and get it ready for the use of others, it is equally within the terms of the grant, so long as the stone is applied to the use of the inhabitants of the town. The. erection of public buildings by the town in its corporate capacity, or of houses and stores by persons not resident in Worcester, to bt occupied and improved by the inhabitants, would be for the use of the inhabitants, and so within the fair intent of the *29 grant. It follows, that the use of stone for building purposes, without the limits of Worcester by inhabitants of other towns, is clearly a violation of the right; and so far as the defendant has procured stone for such purposes, he is liable in this action.
It may be proper to add, that the grant of the right to the stone carries with it, as a necessary incident, the right to enter and work the quarry, and to do all that is necessary and usual for the full enjoyment of the right, such as hewing the stone and preparing it for use. Bainb. on Mines, 49; Cardigan v. Armitage, 2 B. & C. 197.
Unless the parties can agree upon the judgment to be rendered, the case is to be sent to an assessor, to estimate the plaintiff’s damages, if any, upon the principles herein stated.