·Paris Tourtellot & another *vs.* James Phelps.

A grantee of land including the site of a dam, although his deed contain an express grant
of the privilege of flowing, during the winter only, the meadow of the grantor higher up
on the same stream, " for the benefit of carrying on the blacksmith's business," has the
right, as against his grantor, or those claiming under him privileges above or below on the
same stream, to use, at all seasons, for any reasonable purpose, the water of the stream,
including any additional power subsequently created by improvements of his grantor.
A grant, by the owner of two dams on the same stream, of the lower one, and of " a priv-
ilege to draw water sufficient to carry a water wheel well constructed, with twelve feet
head and fall, for two common blacksmith bellows, and, should the head and fall be less·
than twelve feet, sufficient to carry one bellows twelve hours in twenty four hours, in
either case, in the daytime, as near as may be," limits only the extent of the privilege
· granted, and not the use to which it is to be applied.

Shaw, C. J.   This is a very complicated case upon the facts,
involving a long chain of conveyances of different parcels of
land and mill privileges, on one and the same stream; and with-
out a full statement of the conveyances, and a plan of the local-
ities, it would be difficult to make the case intelligible ; but we
think that the questions of law discussed may be briefly stated.

The plaintiffs have a mill and dam above the defendant's shop,
which shop is the subject of this suit; and they have also a mill
privilege and saw mill upon the same stream, below the defend-
ant's shop.   The *gravamen* of the plaintiffs' complaint in this
action of tort is damage to their saw mill below by holding back
the water by defendant beyond his right; and also, in the nature
of trespass, for entering on the plaintiffs' dam above, in several
instances, to let the water down.   The defendant justifies both
the acts complained of, by insisting that he has a right to use
the water as he does, under title and grants, by which the plain-
tiffs are bound ; and that, if it cause any inconvenience to them,
it is *damnum absque injuria.*  ·

The question is upon the extent of the defendant's right at
his shop, at the intermediate privilege.   The question is sup-
posed to depend partly on a deed given by Judah Waters to
Samuel Waters in July 1780, hereafter described, but more par-
ticularly upon another deed from Amos Waters, Jr. to the
defendant, dated August 14th 1846.

The plaintiffs maintain that the defendant, in the use of his water privilege, is limited to its use for carrying on the blacksmith business; the defendant, on the contrary, insists that, to the extent to which he has a right to use the water at all, for driving machinery, he has a right to use it for any purpose that he thinks fit, and is not limited to its use in carrying on any particular business.

It is agreed that, for the last nine years, the defendant has carried on the manufacture of paper machinery, and has not used the water for carrying on the blacksmith business. It is also conceded that he has used no more water for the purpose of running his machinery than would be sufficient for the blacksmith business, as specified in the deed of Amos Waters, Jr. It is also agreed that the defendant, in a prudent and careful manner, hoisted the gate at the dam of the plaintiffs' carriage shop, between the 1st of May and the 1st of July 1854, after being forbidden by the plaintiffs.

It is then submitted to the court, that if the defendant has a right to draw and use water from the plaintiffs' dams, as he claims, for the manufacture of paper machinery and other machinery, in a prudent and careful manner, then the plaintiffs shall become nonsuit. But if the court shall be of opinion that the defendant's right to draw and use water upon said stream is limited as they claim, then the defendant shall be defaulted, and the damages for any over draft or excessive use of the water shall be ascertained by a jury.

The earlier deed of Judah Waters to Samuel Waters, after conveying the premises by metes and bounds, understood to embrace the site of the dam, proceeds thus: " Together with the privilege of flowing the meadow up the brook from the premises, and keeping up the dam to flow said meadow annually to the first day of April, for the benefit of carrying on the blacksmith's business at the shop on the premises: provided the water is not to be raised to flow said meadow till the first day of November annually, and not be kept up after the first day of April annually, except it be by consent of each party. And the said Samuel Waters is hereby granted liberty to pass and repass

to said dam, and repair the same, as shall appear beneficial for the uses aforesaid of carrying on said works by water." If the right now drawn in question in this suit depended upon this early grant, it would be necessary to inquire into many particulars, as to the extent to which the grantor owned the land on the stream, whether any, and if more than one, how many dams existed on the stream, and at what places ; but for reasons which will afterwards appear, this deed, though apparently much relied on, has little to do with the present question.

By force of this early deed, Samuel Waters took the land through which the stream passed, and (independently of the special grant of a right to flow the meadow in winter) took with it, as parcel, a right to the natural flow of the stream for mill power. The additional clause merely gave an additional right to flow the grantor's meadow, that is, to raise the water out of its natural bed so as to overflow its bank at certain seasons. If the grantor, or those taking his estate, chose afterwards to flow the meadow, or convert it into a reservoir, for his or their own convenience, or gave the right to others, so as to keep up the water the whole year, the defendant and the owners of his privilege lower down, had the benefit of it, as the natural flow of the stream, and no right of such owners was violated. But suppose the grantee had exceeded the privilege thus granted, either by taking more water, or at a different season from that granted, nobody could take advantage of that but the grantor, or those who had taken his estate in the meadow flowed, and then indeed it would be very questionable whether they could have any remedy but that of damage for flowing land under the mill acts. And it seems to be plain, from the facts conceded, that it is not the defendant's dam which flows the meadow, but the dam above, at the carriage shop, or some other one still higher.

On the contrary, the plaintiffs claim as owners of the dam at the carriage shop, next above that of the defendant, and the *gravamen* of the complaint is, that the defendant, in several instances, came to their dam, and hoisted their gate, and in some instances, after the first of April and before July, contrary to his just right.

The question which has been mainly discussed arises from the effect and legal construction of the deed of Amos Waters, Jr. to the defendant of August 14th 1846, by which Waters granted to the defendant an estate described, with an old dam contemplated to be rebuilt, so as to raise water, and then adds, "and also quit-claim all my rights to draw water from the pond above the premises, which I hold by virtue of the deed of the grantee to me." This deed, we understand, is the deed under which the defendant now holds the middle privilege, the extent of which is the subject of this suit, and it grants the old dam on the premises, decayed and contemplated to be rebuilt. It also grants certain rights to draw water from the dam above the premises, which we understand to be the plaintiffs' dam by the carriage shop. But these rights are not otherwise defined or described except as those " which I hold by virtue of the deed of the grantee."

In looking for a description of this right, we are referred to the deed thus mentioned, being a warranty deed from the defendant to said Amos Waters, Jr., dated June 22d 1835, and recorded. There the right is expressed in these terms : " A privilege to draw water from my dam, near the shop built by Colonel Daniel Tourtellot, and one above, sufficient to carry a water wheel, well constructed, with twelve feet head and fall, for two common blacksmith bellows, and, should the head and fall be less than twelve feet, sufficient to carry one bellows twelve hours in twenty four hours, in either case, in the daytime, as near as may be." If Waters acquired a title by the deed from Phelps to him, as we suppose he did, the same right was reconveyed to Phelps, the defendant, by the deed of 1846, and the question is upon the construction of this deed.

It is contended by the plaintiffs that the grantee had no right to the use of the water at his machine shop, except for the purpose of carrying on the blacksmith business, and that by his deed to Amos Waters, Jr. he limited the grantee's right to the blacksmith business.

Where a right to water power is derived solely from grant, for the use of water to be taken from another's dam, or a dam on another's land, where the whole right is an incorporeal here-

ditament, and not a parcel of land with a current of water through it, the terms of the grant, as the sole source of the right, are to be carefully looked to ; and so where a water privilege is granted to be used on land granted at the same time, but where the right granted is part only of a larger mill power, to be taken from another's dam. Where such grant makes reference to a purpose or object for which the water power is contemplated to be used, it is often a question of some difficulty, in construing the grant, to determine whether it was the intention of the parties to grant the privilege of water power to be applied to a specific use named, and not to be used for any other purpose, and cease when it ceases to be so used; or whether a reference to such purpose is made only to define and limit the quantity of power thus granted. When it is clear either way, upon the terms, courts will hold accordingly. But when the question is left doubtful, the tendency of courts is to interpret them as a measure of the quantity of power granted, and not as limiting them to a specific use ; because this interpretation is more consonant with the probable intentions of parties, and most consistent with public policy. These positions, and the reasons for them, are fully stated in the case of *Ashley* v. *Pease,* 18 Pick. 275. Such a construction is best suited to enable the grantee to adapt his works to the progress of improvement in the mechanic arts. A valuable water power, to be used for one specific purpose only, which would be highly profitable and beneficial to the owner, at one time and in one state of mechanical industry, would in a change of circumstances become nearly worthless, if confined to the same use. The case of *Ashley* v. *Pease* was one where the grant, though accompanied with a conveyance of land, was not a right to the natural flow of the stream, but only to a small derivative right of water power from the dam of the grantor ; and the court held, that under the special terms of that grant, the grantee was limited to the use of water for a fulling mill only.

In applying these rules to the present case, the first remark is, that the defendant does not derive his principal right from the grant; as owner of the soil through which the watercourse flows,

he has a right, as such owner, to all the benefits to be derived from the natural flow of the stream, and to any benefits added to it by the improvements of others, by the establishment of reservoirs above. The only right which he specifically derives from this grant is, to avail himself of the use of the plaintiff's dam, to draw and use water, and at suitable times, and so far as necessary for the enjoyment of that grant, to enter on the plaintiffs' dam and hoist a gate, using the water prudently and carefully, and in no greater quantity than that limited by the grant. That grant was, " a privilege to draw water sufficient to carry a water wheel well constructed," in one case to carry two common blacksmith bellows, and in the other event to carry one bellows twelve hours in twenty four hours, in either case in the daytime, as near as may be. The court are of opinion, that these terms designate the extent of the privilege, the measure and limit of the power granted, and not the use to which it shall be applied. It was water *sufficient*, water enough to accomplish a given amount of work, and not for doing that work exclusively. It being conceded that this quantity has not been exceeded, although applied to the manufacture of paper machinery, and not to the driving of blacksmith bellows, in this respect he has not exceeded his right. It contains no limitation to the season of the year; and, for the reasons above given, the limitation in the old deed of Judah Waters to Samuel has no application.

In this deed, there is no limitation as to the season of the year, and no other, except the time of day during which it shall be used, of the violation of which no complaint is made.

The plaintiffs then maintain that Phelps had no authority to make the grant which he did make to Amos Waters, Jr. in 1835. This we think is founded on the mistaken hypothesis that his title, and that of the various proprietors on the stream, are derived mainly, if not exclusively, from the early grant of 1780, from Judah Waters to Samuel Waters, and therefore subject to the restraints, conditions and limitations expressed in that deed; whereas, from the nature of the case, no one of these proprietors, except perhaps the highest, or first below the meadow authorized to be flowed, was affected by this early grant. To

explain this more fully, it may be proper to state the familiar rule of law in this commonwealth, which is, that each propri- etor of land through which a natural watercourse flows has a right, as owner of such land, and as inseparably connected with and incident to it, independently of the mill acts and of all grants and agreements with other proprietors above or below, to the natural flow of the stream through his land, and its de- scent, and all the force to be derived therefrom, for any hydraulic purpose to which he may think fit to apply it. But in order that each may enjoy this right, every one is bound to use it reason- ably as it passes through his own land, so as not to injure the equal right of all other proprietors. He shall not poison or cor- rupt the water; he shall not wholly divert it, or hold it back unreasonable lengths of time, or let it down in unreasonable quantities. What is reasonable, under all circumstances, must depend much on the character of the stream, its relative position, the usage of the country, and the state of the arts, not necessary to be stated for the present purpose. This is the natural and inherent right of each riparian proprietor, and passes with it as parcel of the estate. If either relinquishes any portion of his own right, or acquires that of another, it must be by grant or prescription, that is, by contract, actual or presumed. To this is added the statute right of flowing, with its incidents.

One consideration is important to the present inquiry. It is this, that as each proprietor through whose land a watercourse passes has a right to the natural flow and descent of a water- course, subject to a like reasonable use by all others, he neces- sarily enjoys the benefit of any improvements made by the proprietors above him. If they increase the head waters, for use- ful purposes, by flowing increased areas of land, and by making reservoirs to preserve surplus waters for dry seasons, and thus increase the volume of water for hydraulic purposes, every lower proprietor necessarily enjoys the benefit of it. But in such case no mill-owner below the first, and nearest the meadow or land flowed, can be liable to the landowner for damages. He has done the landowner no wrong by having the increased volume of water at his works, whether he used it or not; such increased

volume of water was inevitable by him; he had not caused it, and could not prevent it. He would not be responsible to the landowner for damage caused by flowing his land, because it was not caused by his dam, but by some one above him, for whose doings he would not be responsible. Indeed, where several successive mills are to be benefited by a reservoir at the head of the stream, it is common for the several proprietors to come into an agreement to contribute proportionally to the expense of an improvement which will enure to their common benefit. But in such case, if the lower mill-owner pays any thing for the benefit he enjoys, it is in virtue of the obligation he has entered into, and not of any duty incumbent on him by law.

Supposing these views of the law to be correct, we think it will be seen what are the rights of the defendant, and how they are derived. He was owner of the land through which the stream passed, and therefore, independently of any grant of water power, had a right to the natural flow of the stream, with all the increased volume of water occasioned by the flowing above, without being responsible to any one; and this independently of the provisions in the deed from Waters to Phelps, explained by the previous deed from Phelps to Waters.

Now when it is urged in behalf of the plaintiffs that Phelps, by his deed to Amos Waters, Jr., could not enlarge the right conveyed by Judah to Samuel Waters in 1780, except as to the time of taking water the whole year, the fallacy, we think, is this: The right to the use of the water for mill purposes was not derived from that grant, and in no degree depends on it. The right to flow a particular parcel of land, by a dam far above the defendant's, was derived from that deed; and if that has not been purchased to make the reservoir, or otherwise, those who have built and maintained the upper dam, which causes the meadow to be flowed, may be responsible, but it does not affect the defendant.

It seems to us sufficient that, at the time of the grant from Phelps to Amos Waters, Jr., he was the owner of the dam at the carriage shop, now owned by the plaintiffs, of which we

32 *

suppose there is no doubt. He held that and the parcel of land, with the old dam, now the site of the defendant's machine shop. If that dam was the first dam on the stream, and in fact flowed land once that of Judah Waters, when he conveyed to Samuel, he might have been under some restraint as to flowing such meadow the whole year; but as that did not affect the general right of riparian owners to the stream for mill purposes, it imposed no limit upon the right granted to Waters. The defendant, Phelps, then owned both sites, the lower one having an old decayed dam upon it, which it was contemplated to rebuild. Out of that right in both sites he carved a new mill power, which he granted to Waters. All the natural and incidental rights of property in a watercourse passed by it. But either because there was not sufficient space, or head and fall, to create a pond of sufficient size and height, between the dam retained by the grantor and the site conveyed to the grantee, or for some other reason, it was thought fit to add to it certain rights to a limited use of water out of the dam of the grantor. This was limited both as to quantity and time of using it. This was an easement or incorporeal hereditament, both created and limited by the grant, and one which Phelps, solely in right of ownership in that dam, had a right to grant and annex to the lower privilege, now held by the defendant. It was granted by one who then held both, out of the upper privileges, for the benefit of the lower, and annexed to it; the upper then must have come to the plaintiffs subject to this easement, and the lower to the defendant, entitled to the benefit of it.

We do not understand that the defendant claims any control of the plaintiffs' dam, or any other right to enter upon it or hoist a gate, than that which is necessary to the enjoyment of the water power granted. A right to a use of the dam to this extent belongs to the defendant under that great rule of construction, founded on the highest considerations of law and justice, that the grant of a principal thing carries all things necessary to the use and enjoyment of the thing granted, which the grantor had power to convey.

On the whole case, the court are of opinion that the defendant

had a right to draw water from the plaintiffs' dam, not exceeding the quantity limited in the deed from Phelps to Amos Waters, Jr., for the manufacture of paper machinery, or other machinery, in a prudent and proper manner, and to enter upon said dam, when necessary for such purpose; and therefore, according to the agreement of the parties, the entry will be *Plaintiffs nonsuit.*

*P. C. Bacon & E. B. Stoddard,* for the plaintiffs, cited *Ashley* v. *Pease,* 18 Pick. 275; *Porter* v. *Griswold,* 6 Greenl. 433; *Adams* v. *Frothingham,* 3 Mass. 352; *Luttrel's case,* 4 Co. 87.

*I. M. Barton,* for the defendant, cited *Ashley* v. *Pease,* 18 Pick. 275; *Blanchard* v. *Baker,* 8 Greenl. 253; *Johnson* v. *Rand,* 6 N. H. 22; *Whittier* v. *Cocheco Manuf. Co.* 9 N. H. 454; *Hurd* v. *Curtis,* 7 Met. 111; *Strong* v. *Benedict,* 5 Conn. 210; *Merritt* v. *Brinkerhoff,* 17 Johns. 306; *Pitts* v. *Lancaster Bank,* 13 Met. 158; *Thompson* v. *Crocker,* 9 Pick. 59.