CAMDEN AND ATLANTIC LAND COMPANY v. EDWIN LIPPINCOTT.

1. The increase of land adjacent to the seashore, derived from alluvial deposits, happening so gradually that the increase could not be observed while actually going on, although a visible increase took place from year to year, belongs to the owner of lands bounded upon the sea.

2. In grants of lands lying along the seashore, the parties act with knowledge of the variety of changes to which all parts of the shore are subject. The grantee, by such a boundary, takes a freehold that shifts

with the changes that take place, and is obliged to accept the situation of his boundary by the gradual changes to which the shore is subject. He is subject to loss by the same means that may add to his territory; and as he is without remedy for his loss, so is he entitled to the gain which may arise from alluvial formations, and he will, in such case, hold by the same boundary, including the accumulated soil.

3. A grant of lands with a boundary "along storm-tide mark of the Atlantic ocean," will leave in the grantee that space of the beach which lies between the ordinary high water and the fast land, and is washed over by unusual tides so frequently as to be waste and unprofitable for use; but the title of the grantee will advance or recede as the line of storm-tide changes from time to time.

4. The Camden and Atlantic Land Company, being the owner of a tract of land bounded on the Atlantic ocean, in 1856 made conveyance to M. of a lot by boundaries extending "to storm-tide mark of the Atlantic ocean," and "thence along said storm-tide mark." After 1856, a large accretion of land occurred in front of the said lot by alluvial deposits, and the line of ordinary high-water mark and also the line of storm-tides were by the accretion carried out a considerable distance further than they were when the deed was made. *Held*, that the title of M. and those who succeeded to his estate was not restricted to the storm-tide line as it was in 1856, but that it extended to the line of storm-tides as that line was carried out by the alluvial increase.

5. If the words of a grant be ambiguous, the court will call in aid the acts done under it as a clue to the intention of the parties.

On rule to show cause, and application for judgment on a special verdict

The Camden and Atlantic Land Company was incorporated in 1853 as a land company, for the purpose of "erecting a town and watering-place on Absecum beach, on the Atlantic ocean." *Pamph. L.*, 1853, *p.* 387. In September, 1853, the company became the owner of fifty-nine and ten-hundredths acres on Absecum beach, which was conveyed to it by Isaac S. Waterman.

In 1852, J. L. Rowan made a map of the lands in that locality belonging to several owners, and delineated upon it streets proposed to be laid out, dividing the lands into blocks. The Waterman tract of fifty-nine and ten-hundredths acres was part of the lands included upon this map.

In 1853, the Rowan map was, by an agreement endorsed on it and signed by the owners of lands respectively—among whom was the land company—adopted as a dedication map.

In 1854, Daniel Morris prepared for the company a map of its tract of fifty-nine and ten-hundredths acres. This map was made from Rowan's map, and on it the blocks delineated on the Rowan map were divided into lots, which were numbered. The Morris map was not produced in evidence. It was made for the purpose of sales of lots, and was lithographed, and the lithographed copies were used for that purpose.

On the Rowan map Pacific avenue is laid down mainly parallel with and away from the ocean. North Carolina and Pennsylvania avenues 'cross Pacific avenue at right angles, and are delineated as extending to the waters of the ocean. Between Pacific avenue and the water there is delineated on this map an irregular indented line, extending the entire length of the shore front, and marked "Line of the Outside Sand Hills." The space between this line and the water is marked "Strand." This line varies in its distance from Pacific avenue. By the scale of the map it appears to be three hundred and thirteen (313) feet from the easterly side of Pacific avenue at North Carolina avenue, and three hundred and seventeen (317) feet at Pennsylvania avenue.

No line of high-water mark appears either on the Rowan or on the Morris map. Nor is the line marked on the Rowan map as "Line of the Outside Sand Hills" delineated on the Morris map, or on the lithographed copies of it.

The company, on the 8th of February, 1856, conveyed to Thomas Miles a lot fronting on Pacific avenue. The deed recites that the company is seized and possessed in fee of certain land and premises situate on Absecum beach, and grants and conveys the following described tract, lot or piece of land situate on said beach, bounded and described as follows:

"Beginning at a point in the southeast corner of Pacific and North Carolina avenues, running thence along the east side of North Carolina avenue, on a course of south, twenty-three degrees east, for a distance of three hundred and twenty

feet, be the same more or less, to storm-tide mark of the Atlantic ocean ; thence along said storm-tide mark, on a course of northeast, for a distance of one hundred and fifty feet, be the same more or less, to the west side of a twenty-feet wide street ; thence along the west side of said street, on a course of north, twenty-three degrees west, for a distance of three hundred and twenty feet, be the same more or less, to the point of intersection of said street with the south side of Pacific avenue ; thence along the south side of Pacific avenue, on a course of south, sixty-seven degrees west, for a distance of one hundred and fifty feet, to the place of beginning, containing the lots marked and numbered on said company's map or plan of lots in said city, as lots one hundred and sixty-three, one hundred and sixty-four, one hundred and sixty-five, one hundred and sixty-six, and a space not numbered on said map, lying between the east side of North Carolina avenue and the west side of said twenty-feet wide street, and the south line or boundary of lot one hundred and sixty-six and storm-tide mark of the Atlantic ocean, the said map having been recorded in the clerk's office of the said county of Atlantic."

With the above deed the following agreement was signed and delivered :

" This agreement, made and entered into this eighth day of February, A. D. 1856, between the Camden and Atlantic Land Company of the one part, and Thomas Miles, of the city of Philadelphia and State of Pennsylvania, merchant, of the other part : Whereas, the said company has granted and conveyed to the said Miles a tract of land lying between the south side of Pacific avenue and storm-tide mark of the Atlantic ocean, and east side of North Carolina avenue, and the west side of a twenty-feet wide street, as by reference to the deed bearing even date herewith will more fully appear, for the consideration therein named :

" Now, this agreement witnesseth that in consideration of the said purchase, the said company hereby agrees to permit the said Miles to fill up the front of the block lying between North Carolina and Pennsylvania avenues, and outside of the

Camden and Atlantic Land Co. v. Lippincott.

line of sand hills or storm-tide mark, as aforesaid, with brush, sand or other proper materials, so as to make the corner of said North Carolina avenue even and opposite to the corner of said Pennsylvania avenue, so that the line between the corner of said avenues may be straight, or nearly so, instead of running diagonally, as the line of said sand hills or storm-tide now runs; and the said Miles hereby agrees to fill up the space as aforesaid, in the manner aforesaid, at his own proper cost and charges, and nothing in this agreement shall be so construed as to make the said company liable for expenses in filling up said space as aforesaid.

"In witness whereof, the president of said company, and the said Thomas Miles have hereunto set their hands the day and year first aforesaid."

This agreement was not under seal, but was signed by Miles and by the president of the company.

Between 1856, when the Miles deed was made, and 1880, when this suit was begun, a large accretion of land occurred in front of this lot by alluvial deposits; and in 1880 the line of ordinary high-water mark was more than twelve hundred (1200) feet further out than the sand hills delineated on Rowan's map.

This suit was brought by the company to recover a lot of land, seven hundred feet by one hundred and fifty feet, lying five hundred and twenty-two feet eastward of Pacific avenue, being part of the land in front of the Miles lot, derived from alluvial deposits. The premises in dispute are about two hundred feet eastwardly of the sand hills delineated on the Rowan map, and extend to within about three hundred feet of the present line of the water.

Lippincott, the defendant, claims title to the premises under the company's deed to Miles of February 8th, 1856.

The case was tried at the Atlantic Circuit, at the term of December, 1882, and a special verdict was taken in the form of findings by the jury of certain propositions submitted by the court.

The plaintiff obtained a rule to show cause why the verdict

should not be set aside. The defendant applied for judgment on the verdict. These motions were argued together.

Argued at June Term, 1883, before BEASLEY, CHIEF JUSTICE, and Justices DEPUE, VAN SYCKEL and KNAPP.

For the plaintiff, *Cortlandt Parker* and *Barker Gummere.*

For the defendant, *Peter L. Voorhees* and *Frederick Voorhees.*

The opinion of the court was delivered by

DEPUE, J. The increase of land at the place in question is land acquired by alluvion, in its legal sense. Mr. Morris, who went to Atlantic City in June, 1853, says these increases were made by storm-tides, and were sometimes greater than at other times; that the increase was fluctuating and gradual —the land sometimes made out and sometimes made in—that the increase at some places was two or three feet, at others a little more, and at others one hundred or one hundred and fifty feet; and that these changes were so gradual as not to be perceptible from day to day. He also says that these accretions began between 1853 and 1855, and continued up to within a few years. The jury finds, I think on the weight of the evidence, that the accretion in question in this suit formed between 1856 and 1880. The agreement between the land company and Miles of February 8th, 1856, is the most conclusive evidence that in 1856, when the Miles deed was made, the fast land had not been extended, either by alluvion or artificial means, beyond the line of the sand hills.

The increase of land adjacent to the seashore, derived from alluvial deposits, happening so gradually that the increase could not be observed while actually going on, although a visible increase took place from year to year, belongs to the owner of the land bounded upon the sea. *Rex* v. *Lord Yarborough*, 3 *B. & C.* 91; *S. C. in H. of L.*, 5 *Bing.* 163; *County of St. Clair* v. *Lovingston*, 23 *Wall.* 46.

In the conveyance from Waterman to the land company, the premises are described as bounded upon low-water mark of the Atlantic ocean. The title of the company, by force of this description, extended to ordinary high-water mark. *Arnold* v. *Mundy*, 1 *Halst.* 1; *Gough* v. *Bell*, 2 *Zab.* 441; 3 *Id.* 624; *Attorney-General* v. *Chambers*, 4 *De G., M. & G.* 206. As between the state and the riparian owner, the alluvial increment would have belonged to the land company. The merits of this case, as now presented, depend, therefore, upon the construction and legal effect of the deed made by the company to Miles February 8th, 1856.

The Miles deed calls for a boundary to and along "the storm-tide mark of the Atlantic ocean." The proof is that at the time this deed was made there was a row of sand hills, which formed a barrier against the overflow of the sea in times of storms, and that the storm-tides reached up against these hills. The jury, by its verdict, has found that in 1856 the line of ordinary high tide also reached to this row of sand hills. If the finding of the jury in this respect is sustained by the evidence, the owner of the Miles title will be entitled to the alluvial increase, even though the line of sand hills had been called for as a monument in the description of the lands conveyed, and was regarded as a fixed boundary; for in that event, the company, in fact, parted with all the land it owned, down to the line of the public right, and retained no land to which the alluvial increase could attach. *Storer* v. *Freeman*, 6 *Mass.* 435–441; *Saulet* v. *Shepherd*, 4 *Wall.* 502.

The beach at Atlantic City in 1856 was a sloping beach. Mr. Osborne, from the Rowan map, calculated the slope to be two degrees and thirty-four minutes, and that, on a perpendicular rise of water of four feet, the water-line would be carried up on the beach from eighty-three to eighty-five feet, indicating a change in the position of the line of water on the beach of one foot and nine inches for each inch of rise in the waters of the ocean. The tides at Atlantic City rise from four to five feet. The sand hills, which were the barriers against the influx of the sea, were a series of small hills,

irregular in form and in line, with breaks occurring at intervals, through which the storm-tides would run inland, and were liable to be cut away and crumbled by extremely high water and to be replaced by the sand brought in by favorable winds.   These sand hills have long since disappeared.   Their removal began in 1857.   The fast land of 1856 has been extended more than twelve hundred feet by alluvial deposits; the avenues have been extended over this acquired land to the new line of the water ; a large summer hotel has been built upon it, and it has been otherwise improved.   Considering the constant changes that occur on the seashore by deposits of sand, brought on by one tide and removed or shifted by succeeding tides, and the variation in the height of tides, due to temporary causes, the disappearance of the sand hills and the altered condition of the beach, it is not surprising that in 1882 the evidence should be conflicting touching the line of ordinary high water relatively to the line of sand hills in 1856—twenty-six years before the trial.

In the view we take of this case, it will not be necessary to examine critically the evidence on this subject.   The line of sand hills is not called for as a boundary or a monument in the Miles deed.   It will also be observed that the Rowan map, which is the only map on which the line of sand hills is delineated, is not, by reference, made part of the Miles deed. On that map the lands are not divided into lots, and the Rowan map was not recorded or filed or deposited in the clerk's office when the Miles deed was made.   It was first placed in the clerk's office for record on the 24th of October, 1882.   It appears also that lithographed copies of the Morris map were in the clerk's office as early as 1860.   Mr. Izard, who was clerk from 1860 to 1865, says that he found them there when he went into office.   Mr. Rape, who was clerk from 1870 to 1875, says they were passed over to him by Mr. Risley, his predecessor, and that he left them in the office at the expiration of his term.   The only map in existence in 1856, when the Miles deed was made, on which the company's lands were divided into lots, was the Morris map and

the lithographed copies of it. These maps were made by the directions of the company for the purpose of selling lots, and were used for that purpose. The numbers of the lots conveyed to Miles, mentioned in his deed, correspond with the numbers marked on these maps ; and it is clear from the evidence that the lithographed copies of the Morris map were intended by the reference in the Miles deed to a map recorded in the clerk's offite. On these maps the line of sand hills is not delineated. At all events, no map is produced or shown in evidence to have been on file or of record in the clerk's office in 1856 which exhibited on it the line of sand hills. That line is not in any way made part of the description of the premises conveyed, and therefore cannot affect or control the legal construction of the deed. *Hoboken Land Imp. Co.* v. *Kerrigen*, 2 *Vroom* 13–17 ; *Negbauer* v. *Smith*, 15 *Id.* 672.

The boundary to the seaward called for in the Miles deed is " the storm-tide mark of the Atlantic ocean." Such a description in deeds is unusual, though the expression " storm-tides" seems to be pretty well understood alongshore. Mr. Osborne, a witness called by the plaintiff, and much relied on, says that the storm-tide line would be where the ordinary storm drives the ordinary tide, and that those extraordinary storms in which the tide runs over everything would not be considered as establishing the storm tide mark ; that for a considerable period after the storm-tide occurs there are evident marks of the height to which it has run—the small materials the tide carries with it are deposited there, and there is an abrasion of the sand there ; that the line which is marked by the drift and by the abrasion of the sand might very well be taken as the line, and that it is plain to see where the extreme storm-tide has reached for a month afterwards at least. This witness also says that the height of the tide varies with the force and direction of the wind—that it would be less with an off-shore than with an ordinary on-shore wind. In answer to the question whether of two storms in the same year, the one more severe than the other, he would say that the storm-tide mark was fixed by the one or the other, he

says that if he were taking that before a jury or any one else, he would say what the height of each was and leave them to judge what was the height of the storm-tide. Albert Conover, another of the plaintiff's witnesses, says that in time of a storm the second tide would be the highest, except when there is a wind blowing against it; that each different tide would come to a different height; that sometimes two or three would come alike; that these storm-tides would leave a mark with the "sea trash or something that drifts" on the shore, and mark how high the tide is along the upland shore; that there is no fixed line along which these different tides will deposit their *débris*, but it varies according to the slant of the shore and the height of the water. Mark Adams, a witness also called by the plaintiff, says that these storm-tides leave a mark upon the shore; that there is a drift of some kind, and the waves and action of the wind will drive it up on shore and leave it there; that when the water recedes the mark would be visible along the shore; that how long such a mark would last would be owing to how much exposed it was; probably it would cover up in a day or two; probably it would be obliterated; portions might be seen for months; it would last until it was covered up. He also says that each one of these tides fixes a line for itself, and each one in a different place. Mr. Leeds, another of the plaintiff's witnesses, testifies that storm-tides vary very much; that he has seen some that would be considered storm-tides that did not come up to the hills at all; that every one has its own mark. And being interrogated with respect to the mark left by storm-tides, he says that the point where the tide runs up to shows where the point is; it will stay there till the wind blows over it, or until another storm-tide comes and makes another mark. Mr. Richards, the president of the company, speaking of the mark on the storm-tide bank, said that the water would back up and leave a mark, and shells would be thrown on the bank by the force of the waves; that he has frequently seen these shells embedded in the bank above the level of the sand at the foot of the hill; that the storm-tide line changed with the

violence of the storm, advanced or receded as the water was impelled further up or lower on the beach, and that it was a mark that changed with each recurring storm, and was fixed, more or less, by the violent character of the storm. All the witnesses speak in the same manner of the variableness of the storm-tides in height and the evanescent character of the mark each one would leave.

A more uncertain and vacillating boundary than that adopted for the seaward line in the Miles deed could not be devised. It cannot be taken as an absolute—a fixed—boundary. It must be treated as relative, and as having relation to the condition of things as they are from time to time.

*Scratton* v. *Brown*, 4 *B. & C.* 485, is the leading case on this subject. The plaintiff sued the defendant in trespass for taking stones from the seashore adjoining the plaintiff's manor. The plaintiff was the owner of the shore between high and low-water mark. The defendant justified under one Taylor, in whom was vested an interest in the shore conveyed by the plaintiff by a deed of lease and release, dated September, 1773. The deed described the premises granted as extending from the south at low-water mark, to the north at high-water mark. It appeared at the trial that since the date of the deed the sea had gradually encroached upon the land twelve or fifteen feet or more, and consequently the high and low-water mark had advanced in the same degree inland since that time. The defendant contended that the deed of 1773 conveyed to the grantees the soil of the shore between high and low-water marks, wherever those marks might be. The plaintiff insisted that the deed conveyed only that part of the shore which, in the year 1773, lay between high and low-water mark, and consequently that he was entitled to recover for any stones taken by the defendant higher up on the shore than the high-water mark reached at that time. The court sustained the defendant's contention, and held that by the deed the right of soil in that portion of land which from time to time lay between high and low-water mark passed to the grantee, and that as the high and low-water mark shifted,

the property conveyed by the deed also shifted. The same rule of construction was adopted by Alderson, B., *In re Hull and Selby Railroad Co.,* 5 *Mees. & W.* 327. He said : " Suppose the crown, being the owner of the fore-shore—that is, the space between high and low-water mark—grants the adjoining soil to an individual, * * * in that case, the right of the grantee of the crown would go forward with the change. On the other hand, if the sea gradually covered the land so granted, the crown would be the gainer of the land." In *Dunlop* v. *Stetson,* 4 *Mason* 349, one Budge became entitled to lands lying on the Penobscot river, together with the flats in front of the land to low-water mark. He conveyed thereout to one McGrathry a lot bounded and described as beginning at "a stake on the west bank of the Penobscot; * * * thence to a stake and stones on the bank of the same river; * * * thence running on the western bank of said river to high-water mark." In a controversy between the representatives of Budge and the grantees of McGrathry, the court construed the grant to the latter as being only to the front line of the bank, excluding the flats. It was suggested that since the period of the grant to McGrathry there had been an encroachment by the gradual wear of the river, and Mr. Justice Story, citing Scratton *v.* Brown, held that if that be so, the grantees of McGrathry must be confined to the bank as it actually existed, and that they had no legal or equitable title to such portion of the flats as stood in the place of so much of the bank as had been washed away. The Supreme Court of Massachusetts applied the same principle of construction to a grant of flats where the river had receded from the shore, and by that means the flats had been considerably increased in extent after the grant had been made. *Adams* v. *Frothingham,* 3 *Mass.* 352. The same court also held that the grantees of the privilege of taking seaweed from the beach below certain land conveyed, were not affected by the gradual shifting of the boundaries of the beach by the action of the sea, but were entitled to take seaweed from the beach wherever the beach might be below

the land conveyed, and that it mattered not whether the sea had gained upon the land or had receded. *Phillips* v. *Rhodes,* 7 *Metc.* 322.

The principle on which these cases were decided is that in grants of lands lying along the seashore, the parties act with a knowledge of the variety of changes to which all parts of the shore are subject. The grantee takes no fixed freehold but one that shifts with the changes that gradually take place. The proprietor of lands having such a boundary is obliged to accept the alteration of his boundary by the gradual changes to which the shore is subject. He is subject to loss by the same means that may add to his territory; and as he is without remedy for his loss, so he is entitled to the gain which may arise from alluvial formations, and he will, in such case, hold by the same boundary, including the accumulated soil. *Tyler on Bound.* 40; *Phear on Waters* 12–43; 3 *Kent* 435; *New Orleans* v. *United States,* 10 *Pet.* 662–717. He takes his title, as was said by Mr. Justice Story, in Dunlop *v.* Stetson, subject to those common incidents which may increase or diminish the extent of his boundaries.

This principle applies as well to a boundary by the storm-tide mark as to a boundary by the high-water mark or by the low-water mark. Such a boundary will leave in the grantor that space of the beach which lies between the ordinary high-water mark and the fast land, and is subject to be washed over by unusual tides so frequently as to be waste and unprofitable for use; but the title of the grantee will advance or recede as the line of storm-tide changes from time to time.

This construction of the Miles deed has been acted upon by the parties. When the Miles deed was made, the line of sand hills against which the storm-tides beat was three hundred and thirteen feet from Pacific avenue, at North Carolina avenue. By the agreement of February 8th, 1856, the company gave Miles a license to fill up in front of his land between North Carolina and Pennsylvania avenues, " outside of the line of sand hills or storm-tide mark, so that the line between the corners of said avenues might be straight." By

filling in under this license the grantee extended the bank out several feet—Mr. Osborne says thirty-six feet—along his premises. The agreement contained no actual grant of the land so to be acquired. It was assumed that the license being executed, the grantee would hold the land obtained by these means under the description in his deed. It appears also that, as the bank was gradually carried out by alluvial deposits, and the acquired land became fit for occupation, it was inclosed, occupied, improved and conveyed in parcels by those who assumed to hold under the Miles title. These acts were done from time to time, openly and without dissent or objection on the part of the company, until October, 1877. If the words of a grant be ambiguous, the court will call in aid the acts done under it as a clue to the intention of parties. *Tyler on Bound.* 124; *Adams* v. *Frothingham,* 3 *Mass.* 362; *Stone* v. *Clark,* 1 *Metc.* 378; *Lovejoy* v. *Lovett,* 124 *Mass* 270; *Livingston* v. *Ten Broeck,* 16 *Johns.* 14–23; *Dunn* v. *English,* 3 *Zab.* 126; *Jackson* v. *Perrine,* 6 *Vroom* 137; 1 *Greenl. on Ev.,* § 293.

The object the company had in view in adopting in its conveyances such a boundary for lands lying along the sea is apparent. It was a company formed for the purpose of building a city, as a place of summer resort. The use of the strip of waste land lying between the fast shore and ordinary high water for a promenade, or for boating and bathing, by residents in the city, and persons who might resort there for pleasure or health, would add greatly to the success of the enterprise. The company seems to have exercised some control in that respect over the beach. Mr. Richards, the president of the company, says that it was a universal assurance given verbally to purchasers of lots, that they should have the privilege of putting bath-houses on the beach for bathing purposes.

We think that, under the description in the Miles deed, the seaward boundary was on the line of the storm-tide, as that line was advanced towards the ocean by alluvial deposits. The proof is that, at the time this suit was brought, the line

of the storm-tides was considerably seaward of the lands in controversy, and consequently the defendant has the legal title to the premises in dispute. But we cannot order judgment in his favor on this special verdict. The jury has found, in the face of the evidence, that the agreement of February 8th, 1856, was not executed by Miles. The verdict, therefore, must be set aside, and a new trial be ordered. The costs of this trial should abide the event of the suit.