JOHN C. GRAY & others *vs.* CITY OF CAMBRIDGE.

Suffolk. November 30, 1904. — November 27, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Easement*, Grant, Prescription. *Deed*, Construction. *Equity Pleading and Practice*, Decree.

A grant by a landowner to a city of " the right to enter upon a strip of land fifteen feet wide . . . for the purpose of laying one or more water pipes for conveying · water from " a certain pond used as a water supply to the city reservoirs on a certain street, " and of examining, repairing and relaying the same whenever· necessary," does not include the right of using the pipes to distribute water· to the consumers from a new city reservoir established elsewhere after the reservoirs named in the deed have been abolished.

To establish a prescriptive right on the part of a city to use water pipes under· ground for a purpose not included in the grant from the owner of the land in which they were laid, the city must prove not only that its wrongful use of the· pipes for twenty years was continuous and adverse, but also that the owner of· the land had knowledge of the use or had the means of knowledge of which he· ought to have availed himself.

In a suit in equity by a landowner to enjoin an unlawful use by a city of water· pipes running through his land which are being used by the city without right as a part of the means of distributing water to the consumers, the interests of the· public, which would be affected by a peremptory shutting off of the water, are to be considered in framing a decree granting the plaintiff the relief prayed for.

THE following statement of the case is taken from the opinion of the court:

This is a bill in equity by the executors and heirs at law of the late Edward W. Hooper, asking that the defendant city be enjoined from causing or allowing water to run through certain pipes laid in Mr. Hooper's land under a grant made by one Stearns, his predecessor in title. The case went to a master, who made an exhaustive report, covering more than fifteen printed pages, in favor of the plaintiffs. To this the plaintiffs took one

exception and the defendant ten. These exceptions are now before us on a reservation of the case made by a justice of this court upon the pleadings, the agreed facts, the order of reference, the master's report and the objections and exceptions thereto.

But two questions were argued. First. Does the grant made by the plaintiffs' predecessor in title give the defendant a right to maintain to-day the pipes laid in the Hooper land? Second. If it does not, has the defendant city acquired such a right by prescription?

It appears from the master's report that in 1855 the Cambridge Water Works, a corporation created by the Commonwealth to furnish water to the inhabitants of Cambridge, fixed upon Fresh Pond as its source of supply, and upon a lot of land situated on the corner of Reservoir and Highland Streets for its reservoir. The scheme of the corporation was to pump the waters from the pond to the reservoir on this hill, which appears to have had an elevation of ninety-one feet, and to distribute it through the city by force of gravity. The distance from the pond to the reservoir in a straight line was about two thousand three hundred and forty feet, of which about one thousand four hundred and fifty-three feet was on the land of one Coolidge and the remaining eight hundred and eighty-seven feet on the land of Stearns, who made the grant here in question. A pumping station was erected on the shore of the pond, a reservoir was built on the top of Reservoir Hill, a twelve inch pipe was laid in a ten foot strip, entering the reservoir at the northwest corner thereof, and water was pumped into the reservoir through this supply pipe. The water ran out on the back side of the reservoir into a main distributing pipe, and thence to consumers throughout the city. This course of business was carried on by the corporation until 1865, when the Cambridge Water Works conveyed all its property to the defendant city, and on December 25 of the following year Stearns made the deed here in question, by which he granted to it and " its successors and assigns, the right to enter upon a strip of land fifteen feet wide, situated in said Cambridge and lying between Reservoir Street and land of Josiah Coolidge, for the purpose of laying one or more water pipes for conveying water from Fresh Pond to the city reservoirs on said street, and of examining, repairing and relaying the same

whenever necessary "; after a description of the strip fifteen feet wide are these words : " being delineated on a plan of a ' Right of Way ' for a 24 inch force main through land of W. G. Stearns ' by J. G. Chase, Engineer and Surveyor,' dated ' Cambridgeport, Dec. 1866,' which plan is to be recorded with this conveyance "; and later in the deed is a provision that the water pipes in the ten foot strip are to be removed by the city and the trench filled up; and the right of the city to use the ten foot strip is to be at an end.

In 1866 and 1867 the city reconstructed the reservoir, making two basins, a larger and a smaller one, and concurrently with such reconstruction erected an iron standpipe forty-five feet in height and six feet in diameter, placing it on the Reservoir Street side of the basins, and in line with the partition separating the basins. The standpipe was built into the side wall or coping of the main structure of the reservoir, the masonry foundations for both standpipe and reservoir wall being the same. The master ruled that the standpipe was a part of the reservoir within the meaning of the grant here in question, and stated that he so considered it in making the findings contained in his report. The supply main laid in the ten foot strip was taken up and a new twenty-four inch supply main, laid in the fifteen foot strip under the grant here in question, was substituted for it. This was connected with the bottom of the standpipe and not otherwise connected with the reservoir or reservoirs. Between the standpipe and the basins of the reservoir was a chamber, of a height about the same as that of the reservoir walls, which had two outlets, one connecting with the north basin and the other with the south basin. The standpipe was connected with this chamber by a horizontal pipe which was about five feet above the bottom of the standpipe. When the high pressure service was not in operation, the water coming up the twenty-four inch supply main flowed into the bottom of the standpipe; when it rose to the level of the horizontal pipe, it flowed from the standpipe through this horizontal pipe into the chamber; and when it rose in the chamber to the height of the outlets into the basins, it flowed from the chamber into the basins. Each basin had an outlet into a pipe on the other or back side of the reservoir, which was

connected with a twenty-four inch distributing main in High-land Street. This twenty-four inch distributing main extended through Reservoir and Highland Streets and thence on for general distribution purposes. This twenty-four inch distribut-ing main also was connected with the bottom of the standpipe on the same level as that of the entering twenty-four inch supply main, for use when the high pressure service was in operation. When the high pressure service was in operation, a valve in the horizontal pipe connecting the standpipe with the chamber between the standpipe and the two basins of the reservoir was closed. This prevented any water flowing into the basins of the reservoir, and it was forced to the top or nearly to the top of the standpipe, where the excess escaped through an overflow pipe down into the chamber, whence it found its way into the reservoir basins; or, if they were full, into a sewer by means of an overflow pipe running from the chamber itself. The high service consisted, first, in pumping water to the top of the standpipe, and then pumping against this column of water, thus forcing water into the twenty-four inch distributing main which was connected with the standpipe at the bottom of it and on the same level with the twenty-four inch supply pipe, and thence on for general distribution pur-poses. The object was to supply water under a sufficient head or pressure to make it rise to the attics of houses situated so high that they could not be served under the pressure which the main reservoir itself afforded. These houses were provided with tanks of considerable size, so that the latter filled with water during an interval of high pressure from the standpipe, could furnish a supply until the next succeeding interval of high service. When the high service was in operation, valves were shut in the outlets of the two basins, and the entire water supply of the city, under the extra pressure due to the high level in the standpipe, was fed directly from the standpipe alone. During the hours of ordinary service, whether the pumps were idle or in operation, the street mains throughout the city were fed partly from the rear outlets of the reservoir, and partly from the outlet at the bottom of the standpipe; and concurrently therewith, if the pumps were running, (i. e. the pumps which pumped the water from Fresh Pond, not the high service

pumps,) the water entering the standpipe normally would flow, some of it into the reservoir basins, and some directly out at the bottom outlet of the standpipe; that is to say, save the comparatively brief intervals when the high service was in operation, the water pumped into the standpipe found its way to the street distribution system, some by way of the reservoir basins, and some directly through the standpipe's bottom outlet; and during the hours of high service more or less water overflowed to the reservoir basins from near the top of the standpipe in the manner above shown, for, when the engines were working, they always supplied water in excess of the city's requirements; and during such ordinary hours the waters in the standpipe and reservoir basins would have the same level (even though that level might, owing to a cessation in pumping, be below the horizontal pipe), since the two had an underground interplay through the two pipes which were connected with each other at or by means of the Highland Street main, that is to say, the twenty-four inch outlet pipe from the bottom of the standpipe, and the pipe which came from the rear outlets of the reservoir.

In May, 1873, a twenty inch cement distributing main was connected with the twenty-four inch supply main at a point in Reservoir Street about forty-five feet short of the standpipe. This twenty inch cement distributing main was also connected with an outlet from the reservoir's north basin. This distributing main carried water to consumers living on the opposite side of the city from that fed by the twenty-four inch main in Highland Street. There was a valve in the outlet connecting the north basin with the cement distributing main, so that when the high pressure was in operation the water pumped against the column of water in the standpipe did not flow into the reservoir, but was sent under the extra pressure through the twenty inch distributing main to consumers. The water pumped from the pond, except during the hours of high service, may be considered as being separated into three currents, one of them developing itself at the point of connection with the twenty inch cement pipe and flowing into that direct from the twenty-four inch pumping main, the second developing itself within the standpipe and flowing direct into its twenty-four inch bottom outlet (the pipe which formed the beginning of the

Highland Street main), and the third continuing straight on into the chamber and the basins of the reservoir. And such portion of the water as reached the reservoir basins fed both the Highland Street main and the twenty inch cement main in Reservoir Street.

In 1874 a second supply main was laid in the fifteen foot strip. This, together with the twenty-four inch pipes and its connections already described, is shown in the accompanying sketch. The thirty inch main supplied water, during ordinary

service, both to the Highland Street main direct and to the reservoir basins through the standpipe; and during high service, solely to street mains, except as some would reach the top of the pipe in the standpipe and, overflowing, run down into the chamber and thence into the reservoir basins.

In 1882 a twelve inch supply main was laid in the fifteen foot strip to separate completely the high service from the gravity system. From this twelve inch supply main an eight inch connecting pipe was run to a new and separate system of distribution pipes for the supply of such parts of the city as required high service. While this pipe was in service no water went from it into the reservoir except such as overflowed at the top of a pipe within the standpipe against which the pump acted.

In 1895–1896 a new reservoir was built at Payson Park, and

the reservoir in question was abandoned.  The new reservoir was at an elevation of one hundred and seventy-nine in place of ninety-one feet.  This was sufficiently high to supply all the city by gravity, and the high service pumping system was discontinued.  All the water that gets to the new reservoir is pumped from Fresh Pond.  The outlet of the new reservoir was a forty inch pipe which was connected with the twelve inch supply main constructed for high service, where Huron Avenue crosses the pipes in what was originally the Coolidge land, between Fresh Pond and the old reservoir; and thereafter the high service distributing mains were supplied with water from the new reservoir by gravity.  Connections were made at the same place between this forty inch distributing main coming from Payson Park reservoir and the other two supply mains, i. e. the twenty-four inch and the thirty inch mains, and by these connections water flowed into the old reservoir until 1898, when gates at the reservoir in all pipes that led into or out of it were closed.  Three years later, in the spring of 1901, the ends of these pipes were permanently capped, the entire structure was razed to the ground and the reservoir site deeded back under a clause in the deed by which the city originally took title.  The continuations down to the pumping station at Fresh Pond of these three supply pipes (the twelve inch, the twenty-four inch and the thirty inch pipes) were closed by gates inserted therein at that end, but their existing connections with the pumps were retained, so that water might be pumped through these three supply pipes in case of accident to the system as ordinarily used.

The master ruled that water which was pumped into the distributing mains under the high-service pressure, and the water which, when the high service was not in operation, flowed into the cement main from the twenty-four inch supply main, together with that which then flowed into the Highland Street main from the thirty inch supply main, was not covered by the grant.  He found that all three supply pipes (the twenty-four, thirty and twelve inch) are now used solely as part of the system of distribution pipes of the city, the twelve inch pipe since 1896, and the twenty-four inch and thirty inch pipes since 1898.  He also found that the use of these three pipes for the

conveyance of water directly into the distribution system, concurrently with the conveyance of water into the reservoir, continued in the case of each pipe for over twenty years. In the case of the twenty-four inch and the thirty inch pipes, the twenty years were completed in Mr. Hooper's lifetime; in the case of the twelve inch pipe, one year was to be added when he died; and the use continued for more than a year after his death.

The master then went into a careful statement from which he concludes that Mr. Hooper was not chargeable with knowledge that the pipes laid in the fifteen foot strip were being used wrongfully. The principal claim of the defendant city is that he was chargeable with this knowledge because he must have known that the pipes were being used for high pressure service. The master ends with a finding on the facts reported, " that Mr. Hooper had no knowledge, and was not chargeable with knowledge, of the fact that any one or more of the three pipes in suit were being used to convey water directly into the street distribution system without the intervention of the reservoir."

In conclusion the master found (first) that " said reservoir on Reservoir Street having in 1901 been totally and permanently discontinued and abolished, and the city having thereupon conveyed and disposed of the land used as its site (see agreed statement, paragraph 9), I rule that the easement granted by the Stearns deed of December 25, 1866, terminated in 1901 "; and (second) that all three pipes were for a period of more than twenty years wrongfully used for conveying water from Fresh Pond directly into the street distribution system concurrently with the authorized use of conveying water from Fresh Pond to the reservoir; that the wrongful use was continuous and adverse, but that it lacked the third element necessary to make it ripen into a right by prescription, namely, user in such an open and notorious way as to raise a legal presumption of knowledge and acquiescence on the part of the servient tenant.

The one exception taken by the plaintiffs was that, so far as the place from which the water was conveyed is concerned, the use made of each of the three pipes subsequent to the connection thereof in Huron Avenue with the forty inch main was a new use, different from the use of the pipes theretofore made. This has not been argued.

The case was argued at the bar in November, 1904, before *Knowlton*, C. J., *Morton, Barker, Hammond*, & *Loring*, JJ., and afterwards was submitted on briefs to all the justices. Mr. Justice Barker died before the decision of the case.

*John Chipman Gray & Roland Gray*, for the plaintiffs.

*H. R. Bailey*, (*G. A. A. Pevey* with him,) for the defendant.

LORING, J. [After the foregoing statement of the case.] We are of opinion first, that the master's construction of the Stearns grant is substantially correct; and second, that pipes laid under this grant can be used as supply pipes only and cannot be used as distribution pipes.

What are the terms of the grant? They are (1) "to enter upon a strip of land fifteen feet wide," which strip of land is (2) "situated in said Cambridge and lying between Reservoir Street and land of Josiah Coolidge," (3) "for the purpose of laying one or more water pipes," which pipes are to be used (4) "for conveying water from Fresh Pond to the city reservoirs on said street [Reservoir Street]," and (5) "of examining, repairing and relaying the same whenever necessary."

The question comes down to this: For what purpose were these words inserted: "for conveying water from Fresh Pond to the city reservoirs on said street"? and what effect is to be given to them?

They were not inserted to describe the termini of the fifteen foot strip. That was stated fully elsewhere. There is the previous description of the fifteen foot strip as a strip of land "lying between Reservoir Street and land of Josiah Coolidge," and the subsequent delineation of it in the plan referred to in the deed. Moreover, as a description of the *terminus ad quem* it is inaccurate. Mr. Stearns's ownership extended only to Reservoir Street; it did not extend across the street to the reservoir.

In the second place these words were not inserted to state the use to be made of the fifteen foot strip. That is stated by the words immediately preceding the clause in question, to wit, "for the purpose of laying one or more water pipes" in it, the fifteen foot strip.

We see no escape from the conclusion that these words were inserted as a description of the use to be made of the pipes to be

laid in the strip. That use is "for conveying water from Fresh Pond to the city reservoirs on said street." That is to say, these pipes are not for general use in the water system of the city, but for the narrower use of conveying water from the supply to the reservoir which is the initial point of distribution. Pipes which are to convey water from the source of supply on a low level to a reservoir on a higher level, which reservoir includes a standpipe to enable the water to reach houses higher than the level of the reservoir, for convenience may be termed (as they have been termed in this opinion) supply pipes. Those which take the water from the reservoir (including the stand-pipe as part of the reservoir) are or may be termed distributing pipes. The limitation "for conveying water from Fresh Pond to the city reservoirs" is in effect a provision that the "water pipes" to be laid in the fifteen foot strip are to be used as supply pipes, thereby excluding their use as distributing pipes, as they are now exclusively used.

The defendant city in effect claims that in spite of the words "for conveying water from Fresh Pond to the city reservoirs on said street," it can use these pipes for any purpose in the water system of the city; that the reservoir was a mere resting place for the water on its way from the supply to the consumer, and the pipes can be used to convey water to the consumer.

So far as we can see, no effect is given to the words in question if that construction is adopted; and unless we can read the words "for the purpose of conveying water from Fresh Pond to the city reservoirs" on Reservoir Street to mean or to include "for the purpose of conveying water from the city reservoirs, wherever situated, to the consumers," the use now made is not covered by the grant. In our opinion the words cannot be so read.

The explanation of the whole matter seems to be found in a suggestion of the plaintiffs' counsel that ordinarily distribution mains are laid in public streets and in public streets only. The unexpected however turns out to be the event in the case at bar, and it has become convenient now for the city to utilize these supply pipes as a link in the distribution system starting from the new reservoir. This remote contingency did not occur to the city when it made its bargain with Mr. Stearns in 1866,

and, by the terms of what was then agreed upon as the trade struck between them, such a use was not included.

It remains to consider the several arguments put forward by the defendant on this point.

The defendant has argued in the first place that the easement is a perpetual one. But if the city thought that it might keep the reservoir at the corner of Reservoir and Highland Streets for an indefinite time, it was necessary to stipulate for a perpetual easement. There is nothing inconsistent in the easement being made perpetual and being limited to the special purpose of being used as a supply pipe. This fact therefore is not in our opinion significant. Neither is it significant that there is no condition attached to it. Being an easement it is not capable of seisin; it lies in grant, not in seisin. For that reason no condition could be attached. The land subject to the easement continues to be the land of the grantor of the easement. He cannot re-enter on himself. The fact that there is no clause reserving to the grantor what is not granted is equally without significance. A proper way of limiting an easement is to specify the purposes for which it is to be used. If an easement is so limited, the land subjected thereto cannot be used by the grantee of the easement for any other than the purpose named. As well might it be argued that when a life estate is carved out of a fee it is not enough that all that is granted is a life estate, in order that the reversion should be preserved to the original owner. For the same reason it is of no importance that the words " for no other purpose whatsoever " found in the grant of 1856 are omitted from the grant in question.* It is enough if an ease-

---

* The deed from Stearns to the Cambridge Water Works was dated May 5, 1856, and began as follows: " Know all Men by these Presents That I, William G. Stearns of Cambridge, in the County of Middlesex and Commonwealth of Massachusetts, Esquire, in consideration of one thousand dollars to me paid by the Cambridge Water Works, a corporation established by the laws of said Commonwealth, the receipt whereof is hereby acknowledged, do hereby grant and convey to the said Cambridge Water Works a right to enter upon a strip of land ten feet in width and extending from the Reservoir of said Corporation in Cambridge to land of Josiah Coolidge, for the purpose of laying one or more water pipes to connect the said Reservoir with Fresh Pond, and of examining, repairing, and relaying the same when necessary, and for no other purpose whatsoever."

The deed from Stearns to the defendant was dated December 25, 1866,

ment is limited to a specific purpose. It never is necessary in a legal conveyance in addition to saying that A is white to add that it is not black. Finally, the defendant argues that if the grantor had intended that the easement should cease in case the city ceased to use the reservoir, it should have said so. But in that event the easement did not cease unless it was made appurtenant to, the land on which the reservoir was built (upon which we do not find it necessary to express an opinion). The easement continues in legal contemplation, to wit, the easement to maintain pipes in the fifteen foot strip for the purpose of conveying water from Fresh Pond to the reservoir. So long as the defendant has no reservoir nothing can be done under the easement, but the easement continues. The city hereafter may erect a new reservoir on the same site. Whether the city can continue the pipes under this continuing easement after razing the reservoir to the ground is another matter.

The defendant gets no assistance by citing *Gloucester Water Supply Co.* v. *Gloucester*, 179 Mass. 365, as to the right of the water company to dam the waters of Little River for a water supply under a vote made by the town of Gloucester in 1682 that " Jacob Davis and others joyning along with him hath liberty of the streame at the head of Little River to sett up a saw milne." The ground of the decision on that point is stated at pp. 379, 380, to be : " It is well settled that the rigid rules of construction which are applicable to modern conveyances are not to be applied to transactions of the kind in question, which took place early after the settlement of the country, when conveyancing was little understood. *Adams* v. *Frothingham*, 3 Mass. 352. *Stoughton* v. *Baker*, 4 Mass. 522. *Green* v.

---

and began as follows : " Know all Men by these Presents That I, William G. Stearns of Cambridge, in the County of Middlesex and Commonwealth of Massachusetts, in consideration of two thousand dollars to me paid by the City of Cambridge in the Commonwealth aforesaid, the receipt whereof is hereby acknowledged, do hereby grant and convey to the sd City of Cambridge, its successors and assigns, the right to enter upon a strip of land fifteen feet wide, situated in said Cambridge and lying between Reservoir St. and land of Josiah Coolidge, for the purpose of laying one or more water pipes for conveying water from Fresh Pond to the City Reservoirs on said Street, and of examining, repairing and relaying the same whenever necessary."

*Putnam*, 8 Cush. 21, 25. For the same reason, the easement granted was not limited to damming the waters of the stream for the purpose of running a saw mill. *Adams* v. *Frothingham*, 3 Mass. 352."

The master in our opinion was wrong in ruling that the use of these pipes for high service was not within the grant. He construed the clause in question to forbid the use of these pipes for conveying water unless that water went into one of the two basins of the reservoir. This was not the case when the high service was in operation, as is explained in the master's report. When the high service was in operation, the water was pumped against the column of water in the standpipe directly into one or another distributing main. But the standpipe was as much a part of the reservoir as the two basins. It is patent that one, if not the main, purpose of getting the new fifteen foot strip was to introduce the high service. Water which flowed into the bottom of the standpipe through the twenty-four inch supply pipe and out of it through the twenty-four inch distributing main while the high service was in operation, was without question water conveyed to the reservoir within this grant. In our opinion no distinction can be made between water pumped through the bottom of the standpipe while the high service was in operation and water pumped under the pressure of high service into the distributing mains at the connections in Reservoir Street, in the immediate neighborhood of it.

We do not find it necessary to consider whether these words permitted the city to convey water from the pond to connections with distributing mains short of but in the immediate vicinity of the city reservoir on Reservoir Street, when those same mains are also connected with the outlets of the reservoir.

If we assume in favor of the defendant that such a use was a wrongful one, it is plain that it has not ripened into a prescriptive right to use the pipes.

The defendant city's claims to this prescriptive right are: First. Since its acts have not been clandestine, it is not necessary for it to show that Mr. Hooper had actual knowledge or is chargeable with knowledge. It is enough that he had the means of knowledge of which he ought to have availed himself. Secondly. That on the evidence the master should have found

as a fact that Mr. Hooper ought to have known of the use in fact made.

The foundation of the establishment of a right by prescription is the acquiescence on the part of the owner of the servient tenement in the acts which are relied on to establish the easement by prescription. This makes it necessary that he should know of those acts or be charged with knowledge of them if he did not in fact know of them. The point has been settled in cases where a party has undertaken to establish a prescriptive right to maintain drains or other appliances under the ground. In such case he must be shown to have known or to be chargeable with knowledge, if he did not in fact know of the use made. *Carbrey* v. *Willis*, 7 Allen, 364. *Hannefin* v. *Blake*, 102 Mass. 297. *Union Lighterage Co.* v. *London Graving Dock Co.* [1901] 2 Ch. 300; [1902] 2 Ch. 557. *Gately* v. *Martin*, [1900] 2 Ir. 269. See also in this connection *Deerfield* v. *Connecticut River Railroad*, 144 Mass. 325, 338; *Ludlow Manuf. Co.* v. *Indian Orchard Co.* 177 Mass. 61, 63.

We see nothing in *Poignard* v. *Smith*, 6 Pick. 172, much relied on by the defendant, inconsistent with this. The owner of the servient tenement cannot avoid the effect of twenty years' adverse user by showing that he was out of the country and so did not in fact know of the acts. A servient owner in that condition comes within the second branch of the rule that he is chargeable with knowledge.

The finding of the master as to what Mr. Hooper knew or was chargeable with knowing went further, but included a finding on the point which we decide was material. We see no reason for disturbing the master's finding upon these questions. We agree with the conclusion reached by him.

There must be a decree for the plaintiffs on terms to be settled by a single justice. The interests of the public are concerned in the peremptory shutting off of the water asked for by the plaintiffs. Subject to such modification as may be called for by those public interests, the plaintiffs are entitled to a decree with costs in accordance with the prayer of their bill.

*So ordered.*