NELSON A. FOOT & another *vs.* MORDECAI BAUMAN.

Berkshire.    September 20, 1955. — November 8, 1955.

Present: QUA, C.J., RONAN, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Adverse Possession and Prescription.  Easement.  Drain.  Equity Pleading
   and Practice,* Master:  conclusion from findings;  Decree.

It is not necessary to the establishment of an easement by prescription
  to prove that the owner of the alleged servient tenement had actual
  knowledge of the use made thereof if it was unconcealed and such that
  he would be reasonably expected to learn of it.  [217–218]
Findings by a master respecting a private sewer running from a large
  house on a steep hill down the hill across other property to a municipal
  sewer and having several manholes with visible covers located on the
  lower property, and "servicing" of the private sewer for many years
  by employees connected with both properties in coöperation, required
  the inference that the use of the private sewer was sufficiently open and
  notorious to create an easement by prescription for such use over the
  lower property in favor of the upper property.  [218]
Failure of a party in a suit in equity to appeal from an interlocutory
  decree confirming a master's report containing an erroneous inference
  from subsidiary findings did not affect the duty of the trial court and
  this court to enter a final decree in favor of that party where that was
  the proper decree required by the subsidiary findings of the master and
  a correct inference therefrom.  [219]

BILL IN EQUITY, filed in the Superior Court on May 8,
1952.

The suit was heard by *Paquet,* J., on a master's report.

*Lincoln S. Cain,* (*Rudolph A. Lewis* with him,) for the
plaintiffs.

*L. George Reder,* (*Sidney I. Katz* with him,) for the
defendant.

QUA, C.J.   This suit is between owners of neighboring
properties located upon a hillside in Stockbridge.   We are
concerned with three parcels of land designated for the pur-
poses of this case as "A," "B," and "C."   Parcel "A,"
owned by the defendant, is the highest of the three.   Par-
cel "B," owned by the plaintiffs, is on the opposite side of

"Old Meeting House Road" and is substantially lower than "A," and parcel "C," also owned by the plaintiffs, is still lower and slopes down to Church Street which skirts the lower part of the hill. The house on parcel "A" is a large residence capable of accommodating some thirty-five persons using bathroom and toilet facilities. On parcel "B" there was also until 1951 a large residence of twenty rooms, with six baths and ten toilets. This house was burned in 1951. The purpose of the suit is to restrain the defendant from causing sewage to flow through a private drain from his house on parcel "A" across parcels "B" and "C" to the town sewer in Church Street.

After confirming the master's report, the judge entered a final decree dismissing the bill. The plaintiffs appeal from the final decree.

The town sewer in Church Street was constructed in 1897. Shortly thereafter and before 1901 Anna Blakeman, who then owned all three parcels, constructed the private sewer in question from her house on parcel "A," across "Old Meeting House Road" and across parcels "B" and "C" to Church Street. Whether the house on parcel "B" had then been built does not appear, but the sewer was provided with a manhole so placed on parcel "B" that the house on that parcel could be and at some time was connected to the manhole, as was also a garage on parcel "B." A second manhole was located near the lower boundary of parcel "B" and a third on parcel "C" near Church Street. Use of the sewer by parcel "B" as well as by parcel "A" may well have been contemplated from the beginning, since only a four inch pipe was used to the first manhole and a six inch pipe was used below that. At any rate, the entire private sewer and all the manholes were on land of Anna Blakeman when constructed.

The defendant claims an easement to use the sewer across land of the plaintiffs derived by implied reservation or implied grant when, as he contends, on two occasions conveyances were made of the separate parcels by a common owner. These claims present questions of some dif-

ficulty and we do not consider them, since we believe that on the detailed findings of the master the defendant's further claim of an easement by prescription must be sustained in spite of the conclusion by the master to the contrary.

The master makes all findings necessary to the acquisition of an easement by prescription in favor of parcel "A" over parcels "B" and "C," except that he finds that the use was not open for as long as twenty years. On this question of openness his pertinent findings, in addition to facts already mentioned, are in substance these: In 1912 one Davis became the owner of parcel "A," the dominant tenement, and used the sewer until his death in 1944. Parcels "B" and "C," the servient tenements, were occupied by one de Gersdorff from 1914 until 1944, a period of about thirty years. He became the owner in 1930. The master finds that there was "no evidence as to the nature of de Gersdorff's occupancy" between 1920 and 1930, and he does not find what the nature of that occupation was prior to 1920. However, it is hardly to be assumed that de Gersdorff's occupancy during any of this time was wrongful. It was apparent that the house on parcel "A" was a large one and would require substantial sewage disposal. The character of the soil and sharpness of the slope rendered a septic tank impracticable. The natural location for a sewer would seem to us to have been down the hill to the town sewer in Church Street. The covers of the three manholes on parcels "B" and "C" were visible on the land. If the presence and location of the manholes did not disclose that parcel "A" drained through them, nevertheless that fact could have been discovered, as it was later (in 1949) by the present plaintiff Nelson A. Foot, by lifting the cover of the first manhole. But if these considerations were not sufficient to render the use "open," there was more. One Krebs was "caretaker" for Davis from 1919 until the death of Davis in 1944. Davis had instructed him to have the sewer cleaned out whenever it became plugged, and he "customarily went onto Parcels B or C to service the

sewer line during the occupancy of de Gersdorff" which continued until 1944. One Fisher, an employee of de Gersdorff, and Krebs "sporadically serviced the sewers, opening the manholes on the catch basins to see if everything was all right." There were stoppages on two occasions, one in 1922 and one in 1940, and on each occasion Krebs and an employee of de Gersdorff attended to the difficulty. There "was always complete cooperation between Krebs and the de Gersdorff caretakers on the question of servicing the sewers." The use of the sewer "was known to de Gersdorff, who occupied the premises during the period 1914 to 1944, since his employees during this time patrolled the sewer line in company with Krebs, the Davis employee, and there was an apparent agreement between Davis and de Gersdorff that in the event of a stoppage the party responsible therefor (either Davis or de Gersdorff, if this could be determined) would pay the cost of cleaning out the catch basin."

The master says that "In order for the use to be open it must be either (a) known to the owner of the servient tenement, or (b) so conspicuous that it could be observed by the public in general." He therefore concludes that since de Gersdorff did not. become the owner of the servient tenements until 1930 and died in 1944, shortly after which the plaintiffs became owners and had no knowledge until 1949, there could be no easement by prescription. In our opinion neither "(a)" nor "(b)" states a correct test of "openness." Expressions can be found in some of the cases seeming to require actual knowledge by the owner. See, for example, *Sargent* v. *Ballard*, 9 Pick. 251, 255; *Powell* v. *Bagg*, 8 Gray, 441, 443; *Smith* v. *Miller*, 11 Gray, 145, 148-149; *Edson* v. *Munsell*, 10 Allen, 557, 567. These expressions seem to have originated in a passage in Bracton in which he refers to a servient owner "qui scivit et non prohibuit,"[1] but they ought not to be taken literally as requiring actual knowledge. So to take them would deprive the principle of prescription of much of its value in quieting

---

[1] This passage is quoted extensively in the case last above cited.

controversy and giving sanction to long continued usages. Later cases take the position that the use may be so apparent that the owner may be presumed to have known of it without proof of actual knowledge. *Deerfield* v. *Connecticut River Railroad,* 144 Mass. 325, 338. In such cases he is said to be "chargeable with knowledge." *Gray* v. *Cambridge,* 189 Mass. 405, 418. In this last case it was said that the owner of the servient tenement cannot avoid the effect of twenty years' adverse user by showing that he was out of the country and so did not know. Other cases are *Attorney General* v. *Ellis,* 198 Mass. 91, 98, *Bigelow Carpet Co.* v. *Wiggin,* 209 Mass. 542, 549, *Gadreault* v. *Hillman,* 317 Mass. 656, 662, and *Aksomitas* v. *South End Realty Co.* 136 Conn. 277, 283. The case of *Oldfield* v. *Smith,* 304 Mass. 590, 593, is distinguishable on its facts.

The requirement frequently stated that in order to create a prescriptive right the use must be "open and notorious" is intended only to secure to the owner a fair chance of protecting himself. In American Law of Property, § 8.56, the rule is set forth in this manner, "To be open the use must be made without attempted concealment. To be notorious it must be known to some who might reasonably be expected to communicate their knowledge to the owner if he maintained a reasonable degree of supervision over his premises. It is not necessary that the use be actually known to the owner for it to meet the test of being notorious." We think this is the true rule. It is supported by Restatement: Property, § 458, comment i, and by Tiffany on Real Property (3d ed.) § 1197.

We are of opinion that upon all the findings of the master, especially taking into account the constant assertion by Davis of his rights and the full knowledge and coöperation by the agents of de Gersdorff for the entire period of about thirty years during the occupancy by the latter both before and after he became the title owner, an inference should be drawn that the use of the sewer was sufficiently open and notorious to create an easement in favor of parcel "A" over parcels "B" and "C."

It is immaterial that the defendant did not appeal from the interlocutory decree confirming the master's report. That decree simply established the facts as found by the master as the facts in the case. It still remained the duty of the trial judge, and it is the duty of this court on appeal from the final decree to see that the final decree is such as the law requires upon the facts found by the master and proper inferences therefrom. *French* v. *Peters,* 177 Mass. 568, 571–572. *Lyons* v. *Elston,* 211 Mass. 478, 482, and cases cited. *Fay* v. *Corbett,* 233 Mass. 403, 409–410. *Watertown* v. *Dana,* 255 Mass. 67, 72. *Zevitas* v. *Adams,* 276 Mass. 307, 317. *Kasper* v. *H. P. Hood & Sons, Inc.* 291 Mass. 24. Logically it would seem that the errors of the master did not affect the final decree, since it was the duty of the judge, as it is our duty, to disregard those errors and to see that the final decree was correct on the facts found, as we think it was. But even if those errors can somehow be said to have affected the final decree, they are subject to correction now under G. L. (Ter. Ed.) c. 214, § 27. *Arey* v. *George Associates, Inc.* 299 Mass. 130, 132. *Crystal Concrete Corp.* v. *Braintree,* 309 Mass. 463, 469.

Inasmuch as the defendant has prevailed upon the merits of the case, there is no occasion to consider his appeal from the overruling of his demurrer. In fact he has not argued the point.

*Interlocutory decree overruling demurrer affirmed.*
*Final decree affirmed with costs of appeal.*