NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-593                                        Appeals Court

        ANGELA CIAMARRA MANCINI[1]  vs.  SPAGTACULAR, LLC.

                        No. 18-P-593.

        Worcester.     January 11, 2019. - August 29, 2019.

            Present:  Massing, Desmond, & McDonough, JJ.


Real Property, Adverse possession, Boundary.  Practice, Civil,
     Findings by judge.



     Civil action commenced in the Superior Court Department on
June 5, 2014.

     The case was heard by Richard T. Tucker, J.


     Barry A. Bachrach for the defendant.
     Damien D. Berthiaume for the plaintiff.


     McDONOUGH, J.  After a jury-waived trial, a Superior Court

judge declared that the plaintiff has acquired by adverse

possession two separate areas of land contiguous to her property

in Shrewsbury.  The defendant, who holds record title to the

disputed land, argues clear error in the judge's factual

_____

        [1] Formerly known as Angela Ciamarra.

findings and legal error in his application of adverse possession doctrine.  We affirm.

Background.  The plaintiff, Angela Ciamarra Mancini (Mancini), first acquired the property known as 110 Oak Street in Shrewsbury on June 1, 2000.[2]  Mancini's property is improved with a single-family home.  To the east, her lot fronts on Oak Street.  To the west and south, Mancini's land directly abuts undeveloped, wooded land owned by the defendant, Spagtacular, LLC (Spagtacular).  A survey plan of the properties, trial exhibit 5, appears in adapted form in the appendix to this opinion.[3]

As shown in the appendix, two areas functionally incorporated into Mancini's yard actually lie beyond her lot lines and within the land held (as of record) by Spagtacular. We refer to them as the disputed areas.  (The exhibit calls each area a "Land of Potential Claim.")  The larger of the two disputed areas is situated behind (i.e., to the west of) Mancini's house, adjacent to her parcel's northwest corner. This is a mowed, grassy area, with no permanent improvements; like the judge we will call it the disputed back area.  The

_____

[2] Mancini acquired title with her first husband; in 2003 the couple conveyed the property to Mancini alone.

[3] This same exhibit was attached to the judge's memorandum of decision.

smaller disputed area is located just beyond one of Mancini's side lot lines, to the south of her house.  This area is largely covered by a paved basketball court, with one permanent post, backboard, and hoop.[4]  As the judge did, we will refer to it as the disputed basketball area.[5]

Mancini filed this action on June 5, 2014.  Spagtacular does not contest that Mancini has established the elements of adverse possession as to both disputed areas for the entire time she has owned the locus, up until commencement of this action,[6] a total of fourteen out of the required twenty years.  See G. L. c. 260, § 21.  Accordingly, this appeal focuses on whether Mancini has proved adverse possession of the disputed areas by her immediate predecessor for the remaining six years, from June 1, 1994 to June 1, 2000.  See Luce v. Parsons, 192 Mass. 8, 12

---

[4] The paved basketball court straddles the lot line, but its larger part extends onto Spagtacular's land.  The paved court does not cover the entirety of the disputed basketball area. There is a perimeter of mowed grass around it.

[5] A leach field located primarily on Mancini's land extends under the northwest corner of the paved basketball court, and a small portion of that leach field is located across the lot line on Spagtacular's land.  The leach field is of little significance, however, because it is entirely underground (and thus not visible), and extends into only a small portion of the disputed basketball area.

[6] Spagtacular agrees that Mancini's possession of the disputed areas was interrupted for purposes of the adverse possession statute, G. L. c. 260, § 21, on the date this case was commenced, even though Spagtacular attempted to make entry on the disputed back area with a bulldozer prior to that time.

(1906) (claimant alleging adverse possession may include evidence of predecessors' possession).  See also G. L. c. 260, § 22; LaChance v. First Nat'l Bank & Trust Co. of Greenfield, 301 Mass. 488, 489-491 (1938).

Relevant to that inquiry, the judge found the following facts after trial (including a view).  Prior to Mancini's purchase of her property in 2000, it was owned by the Schwab family.  Mancini's principal witness, Joseph Schwab (Schwab), moved into the locus in 1983 with his mother and his two brothers, at age sixteen.  From 1983 to 2000, "there always existed a sharp and delineating tree line that rimmed the westerly side and southern portion of" the locus.  That tree line never changed during the Schwab family's occupation of the property.

The Schwab family treated as their own the entire area within the tree line along both the property's southerly and westerly lot lines.  From 1983 until the sale of the property to Mancini in 2000, the Schwab family "maintained, utilized, and considered their own the entire area on the western and southern sides of their lot as extending to and bounded by the tree line.  These areas were maintained by, among other things, mowing, fertilizing, and on the westerly side, the installation of a [thirty-five foot by thirty-five foot] basketball court in 1984

which extends beyond the actual lot line into the [d]isputed [b]asketball [a]rea."

Up until Schwab and his brother left home for college, they mowed and maintained the lawn in the disputed basketball area (around the perimeter of the paved court) and in the disputed back area. After the Schwab brothers left, their mother engaged a lawn service company to perform these tasks. During the Schwabs' residence at the locus, they never sought nor received permission to use the disputed areas. Additionally, the judge expressly found the tree line was in the same location at the time of trial as it had been when the Schwabs lived at the locus.

Discussion. 1. Factual findings. Spagtacular argues that the judge committed clear error in his fact findings. See Kendall v. Selvaggio, 413 Mass. 619, 620 (1992). In particular, Spagtacular argues that the evidence at trial was insufficient to allow the judge to conclude that the Schwabs' "use and maintenance" of the disputed areas "occurred from 1983 through the sale of this property to Mancini in 2000." More specifically, Spagtacular argues that this finding cannot be properly supported by Schwab's testimony because Schwab was not living at the property during the critical six years, from 1994 until 2000. Additionally, Spagtacular argues, Schwab's

testimony was not sufficiently detailed to support the judge's finding.

A finding is only clearly erroneous, however, when "there is no evidence to support it or 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Brandao v. DoCanto, 80 Mass. App. Ct. 151, 154 (2011), quoting Kendall, 413 Mass. at 620-621. "So long as the judge's account is plausible in light of the entire record, an appellate court should decline to reverse it." Brandao, supra, quoting Commonwealth v. Carr, 458 Mass. 295, 303 (2010). Stated another way, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Brandao, supra at 155, quoting Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510 (1997).

Here, we readily consider the judge's finding to be plausible on the record presented. Schwab testified that the thirty-five foot by thirty-five foot paved basketball court was installed in 1984. Before he left for college, he, with an uncle's help, fertilized and mowed the entire grassy area around the perimeter of the basketball court, and mowed (with less frequent application of fertilizer) the disputed back area. The mowing occurred weekly, or even more frequently, using a ride-on mower. Schwab specifically remembered mowing along the edges of

the disputed back area with a hand mower, using the tree line as a guide.

By 1990, when Schwab graduated from college and briefly moved back home, his mother had hired a man to mow, perform other yard maintenance, and plow the driveway. From when Schwab again moved out of the family home in 1991 until his mother died in August 1999, Schwab visited his mother regularly, approximately twice per week. Schwab testified that he knew only the first name of the man maintaining the lawn (Paul), but he did not know a last name or a company name. When Schwab was asked whether he knew what part of the locus the hired man maintained, he replied, "Yes -- the lawn. Otherwise it would have become overgrown." He later testified that at no point between 1983 and 2000 did any part of the yard become overgrown or neglected. When asked specifically if it was his recollection that the disputed back area was always mowed with the rest of the lawn, he answered, "It would be my recollection that that was the case. It had to be, if we weren't cutting it."

Schwab also testified clearly that the tree line never changed from the time he moved in until the property was sold to Mancini in 2000. Similarly, he said the basketball court was never changed or moved. Finally, Schwab testified that the

basketball court was still usable when the house was sold, although some of the painted markings had worn off.[7]

A second witness, Brian Lake, corroborated Schwab's testimony in various respects. Lake testified that he either lived at or frequently visited the home next door, at 108 Oak Street, from 1971 (when he first moved in at six years old) to the time of trial. Lake expressed familiarity with 110 Oak Street and stated that he had no recollection of the disputed back area becoming overgrown at any time. As to the tree line, he said, "I recall it being the same today as it was when we moved in."

Spagtacular argues that Schwab's testimony should be disregarded as speculative because Schwab said the lawn must have been mowed by someone "if we weren't cutting it," because it otherwise would have become overgrown. This is not, however, speculation. It is, instead, a reasonable inference drawn from

---

[7] Between his mother's death and the sale of the property to Mancini ten months later, Schwab testified, "we were up there all the time, clearing the house, painting, cleaning, removing property." "The lawn -- the property was still maintained. The lawn was mowed, leaves were collected, the driveway was plowed." This work, he said, was performed by the same company his mother had been using, and extended to the disputed areas. During the time between when his mother died and the sale, Schwab and his brother "would sometimes go down there and shoot hoops. . . . [L]ike I said, there might have been some chipped paint, and maybe a crack or two in the surface, but it was certainly still usable."

known facts.  Schwab concluded that, because the disputed areas never became overgrown, and because his mother had hired a man to maintain them (an arrangement that continued after his mother's death), the disputed areas must, in fact, have been maintained.

Even if Schwab's statements to this effect were inadmissible as opinion (a questionable proposition),[8] there was no objection or motion to strike at the time of the testimony. Moreover, the judge was free to independently draw the same inference from the facts established by Schwab's testimony, regardless of Schwab's own view that the lawn must have been mowed.  We see no error in the judge's factual finding that the Schwabs maintained the disputed areas from 1983 through June 1, 2000; nor do we see any error in his related findings that the maintenance was "without interruption" and "continuous."

2.  Application of law.  Next, we turn to the judge's application of the law to the facts found, which we review without deference.  See Kendall, 413 Mass. at 621 ("the 'clearly erroneous' standard of appellate review does not protect findings of fact or conclusions based on incorrect legal

---

[8] See Mass. G. Evid. § 701 (2019) (lay witness opinion testimony admissible if "rationally based on the witness's perception," helpful in determining a fact in issue, and not based on scientific, technical, or other specialized knowledge).

standards").  Title can be acquired by adverse possession only upon proof of "nonpermissive use which is actual, open, notorious, exclusive and adverse for twenty years."  Lawrence v. Concord, 439 Mass. 416, 421 (2003), quoting Kendall, supra at 621-622.  Spagtacular makes three arguments as to why the judge could not have properly concluded that the Schwabs actually used the disputed areas in a way that was sufficiently open and notorious.[9]

a.  Maintenance as actual use.  First, Spagtacular asks us to distinguish between maintenance of the disputed areas and "use" of the disputed areas, on the theory that because no one was actually playing on these patches of land during the six years preceding June 1, 2000, adverse possession was not shown.  Spagtacular points out that Schwab's mother was the only person living at the property during this time, and she was in poor health.  As to the basketball court, Spagtacular suggests that the presence of the paved court and single post with hoop was not sufficient to amount to adverse possession unless someone was actually shooting baskets there.  Similarly, Spagtacular suggests that maintaining a lawn for purely aesthetic reasons

---

[9] To the extent Spagtacular claims Mancini failed to prove lawn maintenance was performed regularly enough to satisfy the elements of adverse possession, see Pugatch v. Stoloff, 41 Mass. App. Ct. 536, 540 (1996), we disagree for the reasons already discussed supra.

(as opposed to more active recreation, such as volleyball or badminton) is not an actual "use" for adverse possession purposes.  We disagree.

"The nature and the extent of occupancy required to establish a right by adverse possession vary with the character of the land, the purposes for which it is adapted, and the uses to which it has been put."  LaChance, 301 Mass. at 490.  The requirements of adverse possession are established where the changes made on the land constitute "such a control and dominion over the premises as to be readily considered acts similar to those which are usually and ordinarily associated with ownership."  Id. at 491.  In other words, the adverse possession test is about the "degree of control exercised" by the possessors.  See Shaw v. Solari, 8 Mass. App. Ct. 151, 156 (1979).  See also Sea Pines Condominium III Ass'n v. Steffens, 61 Mass. App. Ct. 838, 847 (2004) (Sea Pines III) ("The acts constituting adverse possession must be inconsistent with the owner's rights; otherwise, they would not place the owner on notice of the competing claim of right").  Perhaps more importantly, the intensity or nature of use required to demonstrate the requisite level of control is context-driven:

> "The actual use and enjoyment of the property as the average owner of similar property would use and enjoy it, so that people residing in the neighborhood would be justified in regarding the possessor as exercising the exclusive dominion and control incident to ownership,

establishes adverse possession in the absence of evidence that his possession is under a license or tenancy."

Shaw, 8 Mass. App. Ct. at 156-157, quoting 3 Am. Law of Property § 15.3, at 765-766 (1974).

In the normal course of family life, a residential back or side yard may be used intensively in years when young, active children live on the property, but much more passively when the inhabitants are older, less mobile, or infirm. Accordingly, the relevant question in this context is not whether the use of land is equally intense for the entire twenty-year period, but whether the possessor has maintained dominion and control for that same amount of time.

Here, we cannot say the judge erred in finding that permanent installation of a paved basketball court and hoop, together with regular maintenance of the grass perimeter around it, was a sufficient exercise of dominion and control to satisfy the actual use requirement. The same is true with respect to the regular maintenance of the disputed back area as a lawn. See Shaw, 8 Mass. App. Ct. at 157 (determination of adverse possession upheld where portion of disputed strip used as suburban lawn, possessors "used various portions of the strip for various purposes, all as they chose," and "their possession of the whole strip was exclusive and indicative of a claim by

them of ownership of the entire locus").[10]  That Schwab's mother

did not use these areas by actually playing on them during the

relevant years does not invalidate the judge's conclusion.

   b.  <u>Mowing as actual use</u>.  Second, Spagtacular makes a

related argument pertaining only to the grassy parts of the

---

[10] Apart from the question whether basketball was actually played on the court from 1994 to 2000, Spagtacular argues that the court had become so dilapidated by the date Mancini purchased the property that its presence could not qualify as an actual use of the land at that time.  We need not, however, consider the legal question of under what circumstances a neglected basketball court would cease to qualify as an "actual use" because the evidence simply does not support Spagtacular's underlying premise that the court was in poor repair.  Schwab testified that he and his brother shot basketballs on the court after his mother died, while they were preparing the house for sale.  At that time, he said, the court was functional.  See note 7, <u>supra</u>.  Mancini recalled that the condition of the court was "quite good" prior to seal coating that was performed in 2005.  "There were no cracks that needed to be filled, the way that the driveway had some cracks that needed to be filled." Mancini also testified that when she moved into the property she replaced the backboard because it was made of particle board and disintegrating.  There was no evidence, however, that the pole holding the backboard was replaced at any time; nor was there any evidence to contradict Schwab's testimony that the court was usable (and, in fact, recently used) as of the date of the sale to Mancini.  Spagtacular asked the judge to infer that because the listing sheet prepared to market the property did not include the basketball court as among the property's positive attributes, the court must have been in disrepair.  The judge declined to make any such finding.  In so doing, he may have found that the listing sheet was simply insufficient to support a reasonable inference about the state of repair of the court. See <u>Commonwealth</u> v. <u>Netto</u>, 438 Mass. 686, 703 (2003) (inferences must be reasonable).  Moreover, even if the suggested inference was reasonable, the judge as factfinder was free to reject it based on his own assessment of the evidence as a whole.  See <u>Crown</u> v. <u>Kobrick Offshore Fund, Ltd.</u>, 85 Mass. App. Ct. 214, 225-226 (2014).

disputed areas, asserting that mowing or lawn maintenance is simply insufficient to establish adverse possession under Massachusetts law and that some more permanent encroachment is required. Today, in Miller v. Abramson, 95 Mass. App. Ct. ___ (2019), we rejected this same argument. Massachusetts jurisprudence does not establish a per se rule that mowing and yard maintenance can never be adequate to establish adverse possession. See Brandao, 80 Mass. App. Ct. at 157 (adverse possession found where among primary activities were cultivation, mowing, and weeding); MacDonald v. McGillvary, 35 Mass. App. Ct. 902, 904 (1993) (adverse possession found where use of land "consisted of little more than maintenance of a suburban lawn"). See also Shoer v. Daffe, 337 Mass. 420, 423 (1958) (where possessor "planted [land] to lawn" and surrounded it with a hedge, possessor's "use was that ordinarily made only by an owner"); LaChance, 301 Mass. at 491 (adverse possession established by acts of control and dominion "similar to those which are usually and ordinarily associated with ownership").[11]

---

[11] Spagtacular relies on Peck v. Bigelow, 34 Mass. App. Ct. 551, 553-554, 556-557 (1993), where activities including mowing of a thirty-by-thirty foot area on which the claimant kept various furnishings was insufficient to establish "actual" possession of the entire lot. Peck, however, does not stand for the proposition that mowing and yard maintenance is, in all circumstances, insufficient to support an adverse possession claim. On the contrary, because the nature and extent of occupancy required to establish adverse possession varies with the character and adaptation of the land, see LaChance, 301

Moreover, here as in <u>Miller</u>, 95 Mass. App. Ct. at ___, the relevant evidence was not limited to mowing of a lawn. The judge also correctly found that the mowing occurred inside a well-defined vegetative boundary that did not move or change during the entirety of the twenty-year period. See <u>id</u>. at ___. The existence of the tree line, in stark contrast to the lawn areas, "allowed for easy identification of what land was being openly used and possessed by the [Schwabs]." <u>Id</u>. at ___. In this context, we see no error in the judge's conclusion that the lawn maintenance performed from 1994 to 2000 was sufficient to qualify as "actual" and "open" use of the disputed areas.

c. <u>Wild and wooded lands</u>. Finally, Spagtacular argues that the judge erred because he should have considered the disputed areas to be wild or woodlands, taking them out of the context of a suburban house lot. We note at the start that the locus is not remote, isolated, or rural in nature.[12]

---

Mass. at 490, "[w]hether, in a particular case, [the] elements [of adverse possession] are sufficiently shown is essentially a question of fact." <u>Kershaw</u> v. <u>Zecchini</u>, 342 Mass. 318, 320 (1961).

[12] Spagtacular's land houses an old warehouse fronting on Maple Avenue, also in Shrewsbury. Both Oak Street and Maple Avenue intersect with Route 9, which is nearby. Schwab testified that he walked to his high school, which was up the street from the locus. The Lake family lived next door. Aerial photographs show various buildings, including the Lakes' home, in close proximity to Mancini's house. And, Spagtacular's own property manager testified to taking photographs of an area being cleared by Spagtacular (apparently to the south of the

Spagtacular's property is, however, undeveloped and densely
wooded.

> "In cases involving a claim of adverse possession to wild
> or woodlands, the claimant generally must establish that
> the land has been enclosed or reduced to cultivation. . . .
> The strict rule applicable to wild or woodlands is,
> however, but an application of the general rule to the
> circumstances presented by wild or uncultivated lands.
> That is to say, the nature of the occupancy and use must be
> such as to place the lawful owner on notice that another
> person is in occupancy of the land, under an apparent claim
> of right; in the circumstances of wild and unimproved land,
> a more pronounced occupation is needed to achieve that
> purpose."

Sea Pines III, 61 Mass. App. Ct. at 848.

Even in a case involving wild or wooded land, the
determination whether certain activities are sufficient to
support an adverse possession claim remains "inherently fact-
specific."  Id.  See LaChance, 301 Mass. at 490 ("Evidence
insufficient to establish exclusive possession of a tract of
vacant land in the country might be adequate proof of such
possession of a lot in the center of a large city").  Here, the
facts supported a finding of adverse possession.  The judge
appropriately found that Spagtacular and its predecessor[13] were
on notice that the disputed areas had been incorporated into the
house lot owned by the Schwabs and then Mancini.  Although

---

locus) from the parking lot of a bowling alley situated on Oak
Street, diagonally across from Mancini's land.

[13] Spagtacular acquired its property in 2013.

Spagtacular's land is wooded, the disputed areas are not within that vegetation.  They are, instead, at the edges of the woods.[14] This is not a situation where the use and occupation relied upon by the adverse claimant occurred in the woods.  See, e.g., Boothroyd v. Bogartz, 68 Mass. App. Ct. 40, 44-45 (2007) (prescriptive easement not established over trails traversing woods); Senn v. Western Mass. Elec. Co., 18 Mass. App. Ct. 992, 993 (1984) (timber cutting insufficient for adverse possession).  Instead, the disputed areas were clearly delineated as outside the wooded and allegedly wild area.  Moreover, they could be easily seen from within the woods by anyone who chose to walk the perimeter of Spagtacular's land.

To be "open," a use must be "without attempted concealment."  Boothroyd, 68 Mass. App. Ct. at 44.  To be "notorious," a use "must be sufficiently pronounced so as to be made known, directly or indirectly, to the landowner if he or she maintained a reasonable degree of supervision over the property."  Id.  On the facts presented here, the Schwabs' and Mancini's use of the disputed areas was both open and notorious, notwithstanding that Spagtacular's adjacent land is wooded and undeveloped.  See id., quoting Foot v. Bauman, 333 Mass. 214,

---

[14] No evidence was presented whether the disputed areas were ever part of the woods now owned by Spagtacular or, if so, when those areas were first cleared and by whom.

218 (1955) ("'It is not necessary that the use be actually known to the owner for it to meet the test for being notorious.' . . . It is enough that the use be of such a character that the landowner is deemed to have been put on constructive notice of the adverse use").

<u>Judgment affirmed</u>.



N

Lake Property

tree line

Land of
Potential
Claim

Mancini
Property

Spagtacular
LLC
Property

tree line

septic

tree line

Basketball
Court

OAK STREET

Spagtacular
LLC
Property

Land of
Potential
Claim

Spagtacular LLC
Property